[Civ. No. 458. Fifth Dist. Apr. 2, 1965.]

ANAHEIM BUILDERS SUPPLY, INC., Plaintiff and Appellant, v. THE LINCOLN NATIONAL LIFE INSURANCE COMPANY, Defendant and Respondent.

402

Carden, Lae, Gray & McGraw, Launer, Chaffee & Hanna, and Daniel L. Stack for Plaintiff and Appellant.

Chandler P. Ward for Defendant and Respondent.

CONLEY, P. J.—Anaheim Builders Supply, Inc., a corporation, sued The Lincoln National Life Insurance Company for the face amount of a $30,000 insurance policy written on the life of Louis O. Palm, one of its key officers. The insurance company defended on the ground of the knowing falsity of, and material concealment by, Mr. Palm's answers in the application (Part Two of the policy) to question No. 10, (when and why he last consulted a physician); No. 12, (failure to note the fact of a known headache); No. 12c, (failure to advise of known chest pains); No. 12g, (failure to state that he had suffered from above-normal blood pressure); No. 12h, (failure to list correctly all electrocardiograms); and No. 12i, (failure to make note of material consultations with a physician). An extended jury trial resulted in a verdict and judgment for the defendant. A motion for a new trial was denied by the trial court and this appeal followed. Appellant urges four points for reversal:

(1) That the evidence is insufficient to support the verdict;

(2) That the court erred in admitting the evidence of Russell Kreider, the underwriter for the respondent who passed on the insurance application; Dr. John L. Humphreys, the defendant's medical director; Walter C. Kennedy, chief underwriter and vice-president of the California-Western States Life Insurance Company, and Dr. Ivan C. Heron, medical director and vice-president of West Coast Life Insurance Company, whose testimony, considered collectively, was to the effect that the insurer would not have issued the policy if full and correct answers had been made by Mr. Palm;

(3) That the court erred prejudicially by refusing five jury instructions requested by the plaintiff; and

(4) That an instruction, offered by defendant, which told the jury that proof of an intent to deceive was not essential to the defense was prejudicially erroneous.

We have given close attention to each of these assignments, and we do not find any error which would warrant a reversal; we are, therefore, constrained to affirm the judgment. We shall examine in turn the four contentions made by the appellant.

## I. THE EVIDENCE IS SUFFICIENT TO SUPPORT THE VERDICT

It should be remembered that the same general rules apply in an appeal of an insurance case as in any other litigation, namely, all intendments are in favor of the judgment; the appellate court has no right to retry the case with respect to factual issues; and its sole duty is limited to the inquiry whether there is substantial evidence to support the verdict of the jury. (*Primm* v. *Primm*, 46 Cal.2d 690, 694 [299 P.2d 231]; *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427 [45 P.2d 183]; *Nichols* v. *Mitchell*, 32 Cal.2d 598, 600-601 [197 P.2d 550]; *Arthur* v. *New House Building Corp.*, 217 Cal.App.2d 526, 529-530 [31 Cal.Rptr. 868].)

With these principles in mind, let us survey the evidence. The answers contained in Part Two of the policy, which the defendant claimed constituted knowing falsity or concealment are are follows:

"10. When did you last consult a
physician or practitioner? 1958
"Name: Dr. Cloyd McAllister
Address: 1842 W. Lincoln Ave.,
Anaheim, California
Illness? None Duration?_____
Details: Routine yearly checkup.
CAA student pilot physical 10-1-58."

"12. To your knowledge have you ever had any of the following diseases or symptoms? Answer 'Yes' or 'No.' If 'Yes' specify each and explain.

a. . . .Headaches? No.
c. Heart Disease, . . . Chest Pains . . .? No.
g. Has any physician in past five years found your blood pressure above normal? No.
h. Have you ever had . . ., electro-cardiogram. . .? If so give particulars. Yes.

i. Have you consulted any physicians or
practitioners the past five years
for any other causes? No.''

The actual facts of his medical history as established by
judicial admissions (defendant's exhibit A), which were
received in evidence, are: ''. . . on May 18, 1957, Louis O.
Palm consulted a physician, namely, Dr. Cloyd North Mc-
Allister at said doctor's office; that on said occasion the said
Palm stated in substance to said doctor that on May 16, 1957,
he had a burning in high mid-chest, followed by a very heavy
and weak feeling in his arms bilaterly [sic], with no radia-
tion from his chest to his arms, and after a few hours sleep
he felt fine and has had no trouble since; that on said occasion
the blood pressure of said Louis O. Palm was taken and re-
corded at 138 systolic, 96 diastolic; that on said occasion said
doctor took an electrocardiogram of the heart of said Louis
O. Palm.

''. . . on February 6, 1959, the insured, Louis O. Palm,
consulted a physician, to wit, Dr. Cloyd North McAllister,
at the office of said doctor; that on said occasion said Louis
O. Palm stated, in substance, to the said doctor that he had
experienced a feeling of nervousness and then a frontal head-
ache, and later a strange feeling of heaviness, weakness of the
chest and arms; and on said occasion the blood pressure of
said Palm was taken and recorded as systolic 158, diastolic
106. That thereupon an electrocardiogram was taken of the
heart of said Palm, whereupon said doctor on said occasion
prescribed that he take Butiserpine four times daily as a seda-
tive, a tranquilizer, and to help lower his blood pressure; that
on said occasion said doctor was unable to diagnose or form an
impression of said Palm's ailment.

''. . . on the occasion . . . said doctor after prescribing
Butiserpine four times daily, requested said Palm to return
to such doctor's office at a later date, which date might have
been one week or might have been two weeks later;

''. . . on February 20, 1959, the said Louis O. Palm con-
sulted a physician, to wit, said Dr. Cloyd North McAllister,
at said doctor's office, and on that said occasion the blood pres-
sure of said Palm was checked and was found to be, and was
recorded as 130 systolic, 90 diastolic.''

The same document contains an admission that a blood pres-
sure of 158 systolic and 106 diastolic is above normal, and that
it is so considered by insurance companies generally.

In addition to the judicial admissions, the defendant relies upon the testimony of Dr. Cloyd N. McAllister as showing facts concerning the physical condition of the decedent that were necessarily within the cognizance of Mr. Palm at the time he gave the answers characterized as wilfully false. Dr. McAllister, a close friend of the decedent and a witness for appellant, testified on direct examination that "this blood pressure isn't exceedingly high," that it was "not too far above normal or the upper limits of normal," and that he wasn't "really alarmed" thereby as to a "cardiovascular difficulty," but "it's one of the things I would have to consider." On May 16, 1957, Palm had "burning in high mid-chest" and "a very heavy feeling in his arms bilaterally." The witness was asked on cross-examination whether such reported symptoms did not cause him to investigate the possibility of a heart involvement; he answered: "I think the thing that would make me think more of it was the feeling of heaviness." The corresponding symptom on February 6, 1959, was "a strange feeling of heaviness, weakness of the chest and arms."

Under cross-examination, the doctor gave testimony which respondent argues at least inferentially indicated knowledge on the part of Mr. Palm concerning his adverse state of health at the time of his February 6th visit:

1) That the Butiserpine pills prescribed by the doctor on February 6, 1959, were to be taken four times daily and that he gave Palm "maybe enough for a week"; and

2) "Q. You do recall though, on February 6, 1959, telling him to come back in one or two weeks, though? . . . A. I am sure I wouldn't have given it to him without asking him to come back to see what effect it had. Q. Did you tell him also when he came back to have his blood pressure checked? A. That I don't know whether I told him to come back to have it checked or come back and let us see what it's doing."

In Dr. McAllister's notes for February 20, 1959, [exhibit "F"] the words "check on blood pressure" with the reading "130/90" appear in his nurse's handwriting; and, on direct examination, the doctor, referring to Palm's February 20, 1959, visit, stated: "Well, he had a blood pressure taken. Apparently he had said something to the nurse about that by the way she has written it down."

On cross-examination, the witness testified: "Q. Did you tell your nurse on the occasion that he came in to check his blood pressure? A. I don't know what I might have just told

her. *Louis knew that his pressure was border-line high, that we were watching it. This is a situation where they often know.* Maybe he was just curious, what is it today.'' (Italics added.)

In answer to question 10, Mr. Palm represented that he "last" consulted a doctor, namely, Dr. Cloyd N. McAllister for "Illness? None" "Duration?_____ "; "Details, Routine yearly checkup. CAA student pilot physical 10-1-58." And answering question 12i, he replied "No" to the query whether within the past five years he had consulted a physician for "any other causes" than those previously specified. He thus did not correctly represent either the date of, the symptoms inducing, or the details of, his "last" and other consultations within "the past five years," his visits to Dr. McAllister on May 18, 1957, February 6, 1959, and February 20, 1959, the existence of the symptoms evidenced in May 1957 and February 1959, the blood pressure tests and electrocardiograms taken on each of such two dates, or his above-normal blood pressure on February 6, 1959. From the direct and inferential effect of his doctor's testimony, Palm's knowledge as to the matters completely or partly omitted from his application could properly be deduced by a jury; for example, Mr. Palm could not reasonably have forgotten that on February 6, 1959, he was given a week's medication to be taken four times daily, or that he was directed to return for a recheck of blood pressure. The jury could properly consider that, although he had known that on May 18, 1957, he had complained to Dr. McAllister of a "burning in high mid-chest," accompanied by a very heavy and weak feeling in his arms, he nevertheless denied, in answering question 12c, that to his knowledge he had ever had the symptom of chest pains; and that although on February 6, 1959, he had complained to Dr. McAllister of a "frontal headache," accompanied by a heavy and weak feeling of chest and arms, he denied, in answer to question 12a, that to his knowledge he had ever had the symptom of "headaches." Similarly, in answer to question 12g he denied that to his knowledge any physician in the past five years had found his blood pressure above normal, notwithstanding that, admittedly on February 6, 1959, Dr. McAllister found his blood pressure to be above normal (158/106), and that the doctor testified on cross-examination to Palm's knowledge thereof.

It appears from exhibit "L" that, on May 17, 1958, Dr.

McAllister examined Palm for a CAA student pilot license, without taking an EKG, and the doctor also so testified. When asked by question 12h "Have you ever had . . . electrocardiogram . . .? If so, give particulars," Palm answered "Yes," and specified as a detail "EKG as part of routine checkup 1958—Dr. McAllister"; thereby he apparently referred to his answer to question 10 as to the "Routine yearly checkup. CAA student pilot physical, 10-1-58"; this ambiguous reference to an innocuous, but nonexistent EKG for a CAA pilot's license inferentially concealed the fact of the EKGs taken May 18, 1957, and February 6, 1959.

Considering the fact that the application was dated the 7th day of April, 1959, it is a fair inference from all of the testimony in the case that Mr. Palm must have known of all or at least part of the salient facts with respect to recent medical examinations and that he must have been aware of his omissions in Part Two of the application. (Code Civ. Proc., §§ 1957, 1958, 1960, 1963, subd. 28.) The fact that there possibly could have been a different conclusion by the jury does not mean that on a successful defense, the party which prevails is not entitled to the benefit of all favorable inferences which are deducible from the evidence. Here, the insurer's questions with regard to past medical history were specific, objective, and simple; they called for matters of fact which normally would be known to every layman with the admitted medical history of Mr. Palm. Thus, there was substantial, although mainly indirect, evidence that his answers in the application constituted both knowing misrepresentations and concealment of the truth.

Were they material? Would correct answers to the questions have resulted in a refusal by the insurance company to issue the policy in its present form? It was judicially admitted that the pertinent questions in Part Two were ". . . designed to be material to the risk." And the evidence of the four insurance experts in those respects was consistent, and if properly admitted, finally conclusive.

Section 334 of the Insurance Code points out: "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."

These four qualified insurance men, two of whom were

employed by the defendant, testified that there is a universal custom and practice among life insurance companies to issue or refuse a policy depending, in large measure, on the answers of the applicant concerning his own past medical history. Illustrative of this testimony, Dr. Ivan C. Heron, the medical director of West Coast Life Insurance Company, gave the following answer: "The general custom and practice of life insurance companies is that they have an Application blank, such as my company does, which is completed by the Soliciting Agent, and called Part One. This covers the essential information as to age, occupation, beneficiaries, and so forth. A medical examiner's form, Part Two, which is a searching set of inquiries asked by the examiner, while alone with the proposed insured, designed to probe all areas of medical, surgical or symptomatic histories of the proposed insured and to remind him of his history he may have otherwise overlooked. This Part Two is completed, then signed by the proposed insured and witnessed by the Medical Examiner. The doctor then examines the proposed insured, and, like any good clinician, he is guided in extra care by the history just obtained. The doctor then completes Part Three of the medical blank to forward to the company.

"Certain data is almost universally acquired by the examiner such as height, weight, pulse rate, blood pressure, heart size and rhythm or signs of impairment in the heart, lungs, abdomen, neurological or genito-urinary systems, together with the examiner's observations and report of evidence of any past or present impairment, either in the physical findings or past history.

"The information so obtained is reviewed by the Home Office underwriter, and any evidence of impairment is critically reviewed in relation to the mortality or morbidity factors indicated. Especially, indication of trouble with the cardiovascular system, by far the greatest insurance hazard, calls for reports from the applicant's physician on his findings and history as well as his electrocardiograms, x-rays, or re-examinations or other necessary procedure he has obtained. When the risk appears to be possibly impaired, the application is postponed until this information is obtained and the underwriting department then estimates the proposed insured's probable rate of mortality based largely on statistical data as well as the Company's past experience and practice to determine whether to decline the risk entirely or to accept

it at a higher premium after determining the premium needed to cover the indicated extra mortality hazard.

"From this study the underwriting department then determines to accept the applicant at standard rates, or at an increased premium rate commensurate with any abnormal risk estimated, or to postpone, or reject completely."

The testimony of the experts established that the policy was issued on the assumption of the completeness and accuracy of the answers made by Mr. Palm, and it was further conclusively indicated that if he had truthfully answered the questions no policy at the standard rate would ever have been issued.

We, therefore, reject the contention that the evidence in the case did not warrant the judgment, unless there was a waiver by respondent of its right to have complete and truthful answers in the application, or an estoppel to urge the defense alleged by it. This claim of waiver or estoppel emanates from the fact that after receiving the application for a policy at the home office, Mr. Kreider caused a letter to be sent to Dr. McAllister requesting further information about some of the Palm answers and asking for a view of the EKG, followed within a few days by a communication from the company to Mr. Ford, its local agent, asking him to see that the requested information was obtained and sent to the company. For some reason or other, Dr. McAllister's office never forwarded the solicited information to the home office, but nevertheless the company did issue the policy. Appellant argues that this amounted to a waiver of any right to insist that the policy was voided by the misrepresentations and concealments of Mr. Palm.

An essential element of both estoppel and of waiver is knowledge of the true facts. There can be no waiver of a right to charge fraud or misrepresentation, except when there is an intention to relinquish a known right (*Mirich* v. *Underwriters at Lloyd's London,* 64 Cal.App.2d 522, 530 [149 P.2d 19]; *Maggini* v. *West Coast Life Ins. Co.,* 136 Cal.App. 472 [29 P.2d 263]; 18 Cal.Jur.2d, Estoppel, § 9, p. 409; 51 Cal. Jur.2d, Waiver, § 3, pp. 308-309; 27 Cal.Jur.2d, Insurance, § 229, p. 719).

It is said in *California-Western States etc. Co.* v. *Feinsten,* 15 Cal.2d 413, 422 [101 P.2d 696, 131 A.L.R. 608]: "Nor may it be said that the insurer could have waived its right to rescind, on the ground of false representations made by the

insured in his answers to the questions as set forth in the application for reinstatement, until the insurer had become aware of the falsity of those representations. (*McDanels* v. *General Ins. Co.*, *supra* [1 Cal.App.2d 454, 460 (36 P.2d 829)]; *Schick* v. *Equitable Life Assur. Soc.*, 15 Cal.App.2d 28, 34 [59 P.2d 163])."

There is no contention that the defendant company or its underwriter ever had actual information of a different medical history than that reflected in Part Two of the application before Mr. Palm's death. However, appellant cites section 336 of the Insurance Code: "The right to information of material facts may be waived, either (a) by the terms of insurance or (b) by neglect to make inquiries as to such facts, where they are distinctly implied in other facts of which information is communicated." If necessary facts are proven, it is, of course, true that an insurance company like any other person, natural or artificial, may be estopped to assert certain facts, or that it may waive some provision of the policy inserted for its own benefit (*MacGruer* v. *Fidelity & Casualty Co.*, 89 Cal.App. 227 [264 P. 501]); it is also true that if an insurance company has actual knowledge sufficient to lead a reasonably prudent person to inquire further relative to representations made by a proposed insured, this may constitute notice of whatever the inquiry would have disclosed. (*Columbian Nat. Life Ins. Co.* v. *Rodgers*, 116 F.2d 705.) Furthermore, if there is an insubstantial error made in good faith in an application which is clearly accompanied by the means of ascertaining the truth, an estoppel may be urged against it in subsequent litigation. (*Turner* v. *Redwood Mutual Life Assn.*, 13 Cal.App.2d 573, 578 [57 P.2d 222].) And, if the insurance company actually has knowledge that the answers of the applicant are untrue, but it nevertheless issues a policy to him, the company may be estopped to claim later that it was defrauded (*DiPasqua* v. *California etc. Life Ins. Co.*, 106 Cal.App.2d 281 [235 P.2d 64]). The record in the present case does not indicate that the insurance company ever had any information prior to the death of Mr. Palm of any fact which differed from the representations which he made in the application, and it does not seem that there is anything in the answers to the questions in Part Two of the application which distinctly implies the existence of facts to the contrary of what is said.

In *Cohen* v. *Penn Mut. Life Ins. Co.*, 48 Cal.2d 720, 728

[312 P.2d 241], the Supreme Court states: "Plaintiff claims that defendant waived the fraud in the deceased's answers. To this point she first argues that the right to information may be waived by a failure to inquire as to facts which 'are distinctly implied in other facts of which information is communicated.' (Ins. Code, § 336.) This argument is untenable for it cannot be said that the fact that the deceased consulted doctors and was diagnosed in a hospital for abdominal pain within two years of his insurance application is 'distinctly implied' in his answer that his last consultation with doctors was '10 years ago'; or that the fact that he had been examined repeatedly by Army doctors is 'distinctly implied' in his answer that he was examined only once, 'U.S. Army induction 1944'; or that the fact that he had had an electrocardiogram is 'distinctly implied' in his answer that he had not had one; or that the fact that he had stated under oath that he had hypertension is 'distinctly implied' in his answer that there had never 'been any suspicion of . . . high blood pressure.' "

A similar analysis of the answers in the present application leads to the same conclusion.

II. THE EVIDENCE OF THE EXPERT WITNESSES TO THE EFFECT THAT THE INSURER WOULD NOT HAVE ISSUED THE POLICY IF CORRECT ANSWERS HAD BEEN GIVEN IN THE APPLICATION WAS PROPERLY RECEIVED IN EVIDENCE.

In *Boyer* v. *United States Fid. & Guar. Co.*, 206 Cal. 273, 276 [274 P. 57], it is said: " 'The better authorities, . . . seem to sustain the rule that the insurance experts may testify concerning the usage of insurance companies generally in charging higher rates of premium or rejecting risks, when made aware of the fact claimed to be material.' "

In *California-Western States etc. Co.* v. *Feinsten, supra,* 15 Cal.2d 413, 424, the court points out that evidence of this type by insurance experts is entirely proper: "Appellants also contend that the court erred in its rulings on the admissibility of evidence presented by insurance experts on behalf of the respondent insurer. This court finds no error in that regard. The questions propounded to those witnesses did not call for an opinion on the question whether the undisclosed facts here in issue were material to the risk. The witnesses were merely asked relative to a usage or custom of insurance companies in the matter of rejecting a risk had the companies been apprised of facts such as here were concealed."

The foregoing express approval of the type of testimony received in the present case should be conclusive.

III. THE COURT PROPERLY REFUSED APPELLANT'S PROPOSED INSTRUCTIONS NOS. 7, 8, 9, 11, AND 12.

In considering appellant's complaint that the court refused certain proposed instructions, we have first gauged the probable impact of the instructions actually read to the jury. After reaching the conclusion that the instructions given were proper and that they fairly presented the issues in the case, we applied the following additional principles to an examination of the refused instructions:

1) ▇ There is no requirement that a trial court must duplicate instructions, or give in separate charges the same essential rule of law that has already been submitted;

2) ▇ A trial court does not owe a duty to amend an instruction offered by either side in a civil case, and if there is an error in the charge as proposed, the court may reject the entire instruction.

▇ Turning to the specific instructions which were refused, we find that some of them introduced factors which did not properly constitute issues in the case. Proposed instruction No. 7 requires that untruthful statements in the application shall be ''wilfully so made''; instruction No. 8 places before the jury the question whether Mr. Palm intended to give false answers; instruction No. 9 poses again the question of ''good faith.'' False quantities would thus be placed before the jury and, although in some parts the proposed instructions are sound, there was no necessity of a reformation of the charges by the court. (See *Maggini* v. *West Coast Life Ins. Co., supra,* 136 Cal.App. 472, 478.)

▇ There is no question but that false or incomplete statements of medical history must be knowingly made in order to constitute a defense. In view of the fact that the jury was told that misrepresentations must not only be material but must be knowingly made, the requirements for a sound legal defense were properly set forth in the actual charge and the additional elements which would have been introduced by the giving of the refused instructions would have been inaccurate and confusing.

▇ Proposed instruction No. 11 of the appellant was incorrect in that it limited itself to the rule that if there were material misrepresentation or concealment knowingly made by Mr. Palm ''the contract would not have been entered into'';

the issue, however, as submitted by the court was not only that in the event of material misrepresentations or concealment knowingly made, the policy would not have been issued but that it would not have been entered into in its present form if there were improper answers or illegal concealment. If upon the full statement of the true facts of the applicant's medical history, the insurance company would only have issued a policy upon the payment of an additional premium, this fact would have constituted a defense. ■■■ The proposed instruction was further deficient in that it did not point out that there can be no waiver or estoppel unless the company so waiving, or estopped, knows the facts, or unless it has knowledge of factors which would "alert it" to the possibility that the risk might be impaired by further information. Furthermore, the last paragraph of the instruction seemed to permit an implied finding by the jury "that the defendant could and should have made an additional investigation into the state of the health of Mr. Louis O. Palm."

Appellant's requested instruction No. 12 rested on the premise that if "the defendant insurance company had knowledge of facts inconsistent with statements in the application," there could be a rejection of the defense, notwithstanding that the application itself contained no such inconsistent facts, that Palm, after the application and before his death made no disclosure of the true facts, and that it was judicially admitted that after the application and before Palm's death no other officer of the appellant company did so. Further, the jury would have been told that "you may consider whether or not facts came to the attention of the defendant Lincoln National Life Insurance Company which alerted it to the possibility that this risk might possibly be impaired, and that further inquiry of the facts was needed," although there was no evidence of such facts.

To summarize, the jury was actually instructed fully and fairly and the refusal of the instructions, offered by appellant, did not constitute error.

IV. THE COURT PROPERLY GAVE THE QUESTIONED INSTRUCTION PROPOSED BY RESPONDENT.

■■■ The instruction given at the request of the respondent which the appellant claims constituted prejudicial error is obviously based upon section 331 of the Insurance Code. The instruction reads as follows "To establish the defense of false representations or concealment on matters material to the risk, the presence of intent to deceive is not essential."

Appellant argues that the giving of this instruction after reading plaintiff's requested instruction No. 6 caused confusion to the jurors. The latter instruction reads as follows:

"In determining whether or not the deceased, Louis O. Palm, misrepresented or concealed his past medical history, which is claimed by the defendant Lincoln National Life Insurance Company to be a defense in this action, you are instructed that the evidence must reflect that there must first be actual knowledge of the fact alleged to have been concealed by the decedent. Subsequent events proving it to be unfounded or false are not sufficient to allow the insurer to avoid the policy."

Actual knowledge of the fact concealed or misrepresented was required; that is conceded by respondent, but "actual knowledge" is not identical with "intent to deceive." In at least two California cases, there is express approval of the principle incorporated in the instruction. One of them is *Telford* v. *New York Life Ins. Co.,* 9 Cal.2d 103, where at page 105 [69 P.2d 835] the Supreme Court says: "A false representation or concealment of fact whether intentional or unintentional, which is material to the risk vitiates the policy. The presence of an intent to deceive is not essential." (See also *Cohen* v. *Penn Mut. Life Ins. Co., supra,* 48 Cal.2d 720, 725.)

In view of the fact that former cases in this state have thus laid down a rule substantially identical with the questioned instruction, we must uphold the court's act in giving it to the jury.

We find no error which would justify a reversal.

The judgment is affirmed.

Brown (R. M.), J., and Stone, J., concurred.