[S.F. No. 24054. June 9, 1980.]

GARY L. TRUMAN, JR., a Minor, etc., et al.,
Plaintiffs and Appellants, v.
CLAUDE R. THOMAS, Defendant and Respondent.

COUNSEL

Werchick & Werchick and Arne Werchick for Plaintiffs and Appellants.

Leonard & Lyde and Gary L. Gregerson, Gerald Hermansen and Charles Bond for Defendant and Respondent.

Claude H. Smart, Jr., Lowell T. Carruth, Peter W. Davis, Judith R. Epstein, Crosby, Heafey, Roach & May, Hassard, Bonnington, Rogers & Huber, Howard Hassard, David E. Willett and Nancy E. Hudgins as Amici Curiae on behalf of Defendant and Respondent.

OPINION

**BIRD, C. J.**—This court must decide whether a physician's failure to inform a patient of the material risks of not consenting to a recommended pap smear, so that the patient might make an informed choice, may have breached the physician's duty of due care to his patient, who died from cancer of the cervix.

I

Respondent, Dr. Claude R. Thomas, is a family physician engaged in a general medical practice. He was first contacted in April 1963 by appellants' mother, Rena Truman, in connection with her second pregnancy. He continued to act as the primary physician for Mrs. Truman and her two children until March 1969. During this six-year period, Mrs. Truman not only sought his medical advice, but often discussed personal matters with him.

In April 1969, Mrs. Truman consulted Dr. Casey, a urologist, about a urinary tract infection which had been treated previously by Dr. Thomas. While examining Mrs. Truman, Dr. Casey discovered that she was experiencing heavy vaginal discharges and that her cervix was extremely rough. Mrs. Truman was given a prescription for the infection and advised to see a gynecologist as soon as possible. When Mrs. Truman did not make an appointment with a gynecologist, Dr. Casey made an appointment for her with a Dr. Ritter.

In October 1969, Dr. Ritter discovered that Mrs. Truman's cervix had been largely replaced by a cancerous tumor. Too far advanced to be removed by surgery, the tumor was unsuccessfully treated by other methods. Mrs. Truman died in July 1970 at the age of 30.

Appellants are Rena Truman's two children. They brought this wrongful death action against Dr. Thomas for his failure to perform a pap smear test on their mother. At the trial, expert testimony was presented which indicated that if Mrs. Truman had undergone a pap smear at any time between 1964 and 1969, the cervical tumor probably would have been discovered in time to save her life. There was disputed expert testimony that the standard of medical practice required a physician to explain to women patients that it is important to have a pap smear each year to "pick up early lesions that are treatable rather than having to deal with [more developed] tumor[s] that very often aren't treatable...."[1]

Although Dr. Thomas saw Mrs. Truman frequently between 1964 and 1969, he never performed a pap smear test on her. Dr. Thomas testified that he did not "specifically" inform Mrs. Truman of the risk involved in any failure to undergo the pap smear test. Rather, "I said, 'You should have a pap smear.' We don't say by now it can be Stage Two [in the development of cervical cancer] or go through all of the different lectures about cancer. I think it is a widely known and generally accepted manner of treatment and I think the patient has a high degree of responsibility. We are not enforcers, we are advisors." However, Dr. Thomas' medical records contain no reference to any discussion or recommendation that Mrs. Truman undergo a pap smear test.

For the most part, Dr. Thomas was unable to describe specific conversations with Mrs. Truman. For example, he testified that during certain periods he "saw Rena very frequently, approximately once a week or so, and I am sure my opening remark was, 'Rena, you need a pap smear,'...I am sure we discussed it with her so often that she couldn't [have] fail[ed] to realize that we wanted her to have a complete examination, breast examination, ovaries and pap smear." Dr. Thomas also testified that on at least two occasions when he performed

---

[1]Dr. Thomas conceded at the trial that it is the accepted standard of practice for physicians in his community to recommend that women of child-bearing age undergo a pap smear each year. His records indicate that during the period in which he acted as Mrs. Truman's family physician he performed between 10 and 20 pap smears per month.

pelvic examinations of Mrs. Truman she refused him permission to perform the test, stating she could not afford the cost. Dr. Thomas offered to defer payment, but Mrs. Truman wanted to pay cash.

Appellants argue that the failure to give a pap smear test to Mrs. Truman proximately caused her death. Two instructions requested by appellants described alternative theories under which Dr. Thomas could be held liable for this failure. First, they asked that the jury be instructed that it "is the duty of a physician to disclose to his patient all relevant information to enable the patient to make an informed decision regarding the submission to or refusal to take a diagnostic test. [¶] Failure of the physician to disclose to his patient all relevant information including the risks to the patient if the test is refused renders the physician liable for any injury legally resulting from the patient's refusal to take the test if a reasonably prudent person in the patient's position would not have refused the test if she had been adequately informed of all the significant perils."[2] Second, they requested that the jury be informed that "as a matter of law...a physician who fails to perform a Pap smear test on a female patient over the age of 23 and to whom the patient has entrusted her general physical care is liable for injury or death proximately caused by the failure to perform the test." Both instructions were refused.

The jury rendered a special verdict, finding Dr. Thomas free of any negligence that proximately caused Mrs. Truman's death. This appeal followed.

## II

The central issue for this court is whether Dr. Thomas breached his duty of care to Mrs. Truman when he failed to inform her of the potentially fatal consequences of allowing cervical cancer to develop undetected by a pap smear.

---

[2] The proposed instruction was a modification of BAJI No. 6.11 (1975 rev.).

The trial court initially expressed tentative agreement with the principle described in this instruction. However, the court thought the instruction was confusing and attempted to assist counsel in developing a more understandable statement. Not satisfied with the resulting modifications, the court refused the instruction without prejudice. When counsel for plaintiffs subsequently requested that the instruction be submitted "the way it'stands...," the court rejected that request. No instruction on this theory of liability was given to the jury.

In *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1], this court considered the scope of a physician's duty to disclose medical information to his or her patients in discussing proposed medical procedures. Certain basic characteristics of the physician-patient relationship were identified. "The first is that patients are generally persons unlearned in the medical sciences and therefore, except in rare cases, courts may safely assume the knowledge of patient and physician are not in parity. The second is that a person of adult years and in sound mind has the right, in the exercise of control over his own body, to determine whether or not to submit to lawful medical treatment. The third is that the patient's consent to treatment, to be effective, must be an informed consent. And the fourth is that the patient, being unlearned in medical sciences, has an abject dependence upon and trust in his physician for the information upon which he relies during the decisional process, thus raising an obligation in the physician that transcends arms-length transactions." (*Id.,* at p. 242.)

In light of these factors, the court held that "as an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each." (*Id.,* at p. 243.) ▇ The scope of a physician's duty to disclose is measured by the amount of knowledge a patient needs in order to make an informed choice. All information material to the patient's decision should be given. (*Id.,* at p. 245.)

Material information is that which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject the recommended medical procedure. (*Sard* v. *Hardy* (1977) 281 Md. 432, 444 [379 A.2d 1014]; *Wilkinson* v. *Vesey* (1972) 110 R.I. 606, 627 [295 A.2d 676, 69 A.L.R.3d 1202].) To be material, a fact must also be one which is not commonly appreciated. (See *Canterbury* v. *Spence* (D.C. Cir. 1972) 464 F.2d 772, 788.) If the physician knows or should know of a patient's unique concerns or lack of familiarity with medical procedures, this may expand the scope of required disclosure. (Waltz & Scheuneman, *Informed Consent to Therapy* (1970) 64 Nw. U.L.Rev. 628, 639-640.)[3]

---

[3]The scope of a physician's duty to disclose is set by law rather than by the custom of physicians. (*Cobbs, supra,* 8 Cal.3d at p. 243.) The physician must also provide "such additional information as a skilled practitioner of good standing would provide under similar circumstances." (*Id.,* at pp. 244-245.)

Material facts need not be disclosed where it is evident that the patient cannot evalu-

■ Applying these principles, the court in *Cobbs* stated that a patient must be apprised not only of the "risks inherent in the procedure [prescribed, but also] the risks of a decision not to undergo the treatment, and the probability of a successful outcome of the treatment." (*Cobbs, supra*, 8 Cal.3d at p. 243.) This rule applies whether the procedure involves treatment or a diagnostic test. On the one hand, a physician recommending a risk-free procedure may safely forego discussion beyond that necessary to conform to competent medical practice and to obtain the patient's consent. (See *id.*, at pp. 244-245.) If a patient indicates that he or she is going to *decline* the risk-free test or treatment, then the doctor has the additional duty of advising of all material risks of which a reasonable person would want to be informed before deciding not to undergo the procedure. On the other hand, if the recommended test or treatment is itself risky, then the physician should always explain the potential consequences of declining to follow the recommended course of action.

Nevertheless, Dr. Thomas contends that *Cobbs* does not apply to him because the duty to disclose applies only where the patient *consents* to the recommended procedure. He argues that since a physician's advice may be presumed to be founded on an expert appraisal of the patient's medical needs, no reasonable patient would fail to undertake further inquiry before rejecting such advice. Therefore, patients who reject their physician's advice should shoulder the burden of inquiry as to the possible consequences of their decision.

This argument is inconsistent with *Cobbs*. The duty to disclose was imposed in *Cobbs* so that patients might meaningfully exercise their right to make decisions about their own bodies. (*Cobbs, supra*, 8 Cal.3d at pp. 240-241, 243.) The importance of this right should not be diminished by the manner in which it is exercised. Further, the need for disclosure is not lessened because patients reject a recommended procedure. Such a decision does not alter "what has been termed the 'fiducial qualities' of the physician-patient relationship," since patients who reject a procedure are as unskilled in the medical sciences as those who consent. (*Id.*, at p. 246.) To now hold that patients who reject their

---

ate the data because, for example, the patient is incompetent or exigent circumstances preclude adequate disclosure. (*Id.*, at pp. 243-244.) "The burden of going forward with evidence of nondisclosure rests on the plaintiff. Once such evidence has been produced, then the burden of going forward with evidence pertaining to justification for failure to disclose shifts to the physician." (*Id.*, at p. 245.)

physician's advice have the burden of inquiring as to the potential consequences of their decisions would be to contradict *Cobbs*. It must be remembered that Dr. Thomas was not engaged in an arms-length transaction with Mrs. Truman. Clearly, under *Cobbs*, he was obligated to provide her with all the information material to her decision.

Dr. Thomas next contends that, as a matter of law, he had no duty to disclose to Mrs. Truman the risk of failing to undergo a pap smear test because "the danger [is] remote and commonly appreciated to be remote." (*Cobbs, supra*, 8 Cal.3d at p. 245.) The merit of this contention depends on whether a jury could reasonably find that knowledge of this risk was material to Mrs. Truman's decision.

The record indicates that the pap smear test is an accurate detector of cervical cancer. Although the probability that Mrs. Truman had cervical cancer was low, Dr. Thomas knew that the potential harm of failing to detect the disease at an early stage was death.[4] This situation is not analogous to one which involves, for example, "relatively minor risks inherent in [such] common procedures" as the taking of blood samples. (*Cobbs, supra*, 8 Cal.3d at p. 244.) These risks are not central to the decision to administer or reject the procedure. In contrast, the risk which Mrs. Truman faced from cervical cancer was not only significant, it was the principal reason why Dr. Thomas recommended that she undergo a pap smear.

Little evidence was introduced on whether this risk was commonly known. Dr. Thomas testified that the risk would be known to a reasonable person. Whether such evidence is sufficient to establish that there was no general duty to disclose this risk to patients is a question of fact for the jury. Moreover, even assuming such disclosure was not generally required, the circumstances in this case may establish that Dr. Thomas did have a duty to inform Mrs. Truman of the risks she was running by not undergoing a pap smear.

Dr. Thomas testified he never specifically informed her of the purpose of a pap smear test. There was no evidence introduced that Mrs. Truman was aware of the serious danger entailed in not undergoing the test. However, there was testimony that Mrs. Truman said she would

---

[4]Expert testimony established that if cervical cancer is detected in the early stages of its development, there is a very high probability that the progress of this disease can be permanently arrested.

not undergo the test on certain occasions because of its cost or because "she just didn't feel like it." Under these circumstances, a jury could reasonably conclude that Dr. Thomas had a duty to inform Mrs. Truman of the danger of refusing the test because it was not reasonable for Dr. Thomas to assume that Mrs. Truman appreciated the potentially fatal consequences of her conduct. Accordingly, this court cannot decide as a matter of law that Dr. Thomas owed absolutely no duty to Mrs. Truman to make this important disclosure that affected her life.

■ The instruction proposed by appellants was a modification of BAJI No. 6.11 (1975 rev.), which was adopted to describe a physician's duty of reasonable disclosure as established by this court in *Cobbs*. Appellants' instruction correctly indicated that a physician has a duty to disclose all material information to a patient. The instruction also stated that breach of this duty renders the physician liable for any "legally resulting [injury]...if a reasonably prudent person in the patient's position would not have refused the test if she had been adequately informed of all the significant perils."

The term "legally resulting" was defined for the jury in accordance with BAJI No. 3.75. The jury was instructed that a "proximate cause of an injury is a cause which, in natural and continuous sequence, produces the injury, and without which the injury would not have occurred." Obviously, this test could not be satisfied if the jury were to conclude that even given adequate disclosure Mrs. Truman would have refused to take the recommended test in time to save her life. Thus, the rejected instruction would have correctly indicated that satisfaction of the prudent person test for causation established in *Cobbs* was necessary but not sufficient for plaintiffs to recover. If the jury were to reasonably conclude that Mrs. Truman would have unreasonably refused a pap smear in the face of adequate disclosure, there could be no finding of proximate cause. Though awkwardly phrased, the rejected instruction accurately reflected the law and a theory of of liability applicable to the facts of this case.[5]

---

[5]Though the instruction required physicians to disclose all "relevant" rather than all "material" information, this distinction would probably have gone unnoticed by a jury of laypersons unfamiliar with the technical meanings of these terms. Use of the term "relevant" served to alert the jury to the need to discriminate between what was important and what was not important to disclose. Given the lack of a general explanation of the concept of materiality in BAJI No. 6.11 (1975 rev.), it would be unfair to demand more of appellants in this case. In the future, however, a more precise explanation should be given.

Refusal to give the requested instruction meant that the jury was unable to consider whether Dr. Thomas breached a duty by not disclosing the danger of failing to undergo a pap smear. Since this theory finds support in the record, it was error for the court to refuse to give the requested instruction. (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 543 [138 Cal.Rptr. 705, 564 P.2d 857]; *Phillips* v. *G. L. Truman Excavation Co.* (1961) 55 Cal.2d 801, 806 [13 Cal.Rptr. 401, 362 P.2d 33].) If the jury had been given this instruction and had found in favor of the appellants, such a finding would have had support in the record before us. Reversal is therefore required. (Cal. Const., art. VI, § 13; see also *Phillips* v. *G. L. Truman Excavation Co., supra,* 55 Cal.2d at p. 808.)

### III

The other contentions of instructional and evidentiary error urged by appellants are considered because these matters probably will arise at any retrial of the case.

■ First, the trial court refused to instruct the jury that "as a matter of law...a physician who fails to perform a Pap smear test on a female patient over the age of 23 and to whom the patient has entrusted her general physical care is liable for injury or death proximately caused by the failure to perform the test." In support of this instruction plaintiffs relied on the decision of the Supreme Court of Washington in *Helling* v. *Carey* (1974) 83 Wn.2d 514 [519 P.2d 981, 67 A.L.R. 3d 175].

That decision involved a suit against two physicians specializing in opthalmology who *failed to recommend* a test for glaucoma. The court held as a matter of law that the exercise of due care required the administration of that test. That holding has no application to this case since the evidence presented showed that the physician recommended the appropriate test but failed to inform the patient of the risks entailed in refusing to follow his advice. The suggestion that a physician *must* perform a test on a patient, who is capable of deciding whether to un-

---

The prudent person test for causation was established to protect defendant physicians from the unfairness of having a jury consider the issue of proximate cause with the benefit of the "20/20 vision of hindsight..." (*Cobbs, supra,* 8 Cal.3d at p. 245.) This standard should not be employed to prevent a physician from raising the defense that even given adequate disclosure the injured patient would have made the same decision, regardless of whether a reasonably prudent person would have decided differently if adequately informed.

dergo the proposed procedure, is directly contrary to the principle that it is the *patient* who must ultimately decide which medical procedures to undergo. Accordingly, the trial court did not err in refusing this instruction.

■ Second, the court refused to admit evidence that Dr. Thomas was convicted in Utah in June 1976 of intentionally falsifying a medical prescription in order to obtain a controlled drug for his own use. (Utah Ann. Code, § 58-37-8, subd. (4)(a)(ii).)

A foreign conviction may not be admitted for impeachment purposes unless it is shown to be a felony under the law of the jurisdiction in which it was sustained. (*People v. Moore* (1970) 13 Cal.App.3d 424, 437 [91 Cal.Rptr. 538]; *People v. Washington* (1967) 248 Cal.App.2d 470, 477 [57 Cal.Rptr. 487]; *People v. Miller* (1961) 188 Cal.App.2d 156, 170 [10 Cal.Rptr. 326]. See Evid. Code, §§ 787, 788.) Utah law classifies the offense for which Dr. Thomas was convicted a felony. (*Rammell v. Smith* (Utah 1977) 560 P.2d 1108.) However, section 76-3-402 of the Utah Criminal Code provides that "[w]henever a conviction is for a felony, the conviction shall be deemed to be a misdemeanor if . . . [t]he imposition of the sentence is stayed and the defendant is placed on probation . . . and he is thereafter discharged without violating his probation."

After Dr. Thomas' conviction, the Utah court placed him on probation for two years and continued pronouncement of judgment for an identical period. Prior to the trial in this case, the court granted Dr. Thomas' request that his probation be terminated. The conviction was thus rendered a misdemeanor. Since the conviction was not a felony, it is not admissible for purposes of impeachment. (Evid. Code, §§ 787, 788.)[6]

The judgment is reversed.

Tobriner, J., Mosk, J., and Newman, J., concurred.

---

[6]Appellants' assertion that the conviction would be admissible for purposes of impeachment in a Utah court, even if true, is of no moment. Only the classification of a foreign conviction is controlled by foreign law; its admissibility is always governed by the law of this state.

**CLARK, J.**—I dissent.

The consent instruction demanded by plaintiffs will impose upon doctors the intolerable burden of having to explain diagnostic tests to healthy patients. To meet their new burden doctors will have to spend the greater part of their day not examining or treating patients, but explaining to them all information relevant to the purposes of diagnostic examinations and tests. Such burden is unreasonable, and the trial court properly refused the instruction. Further, the proposed instruction is erroneous because it is confusing. Counsel's failure to clarify the instruction at the trial court's request should preclude any claim of error.

After the birth of her child, Mrs. Truman underwent a routine six-week checkup on 7 January 1964. Defendant had not suggested a pap smear prior to that time because Mrs. Truman stated she had had a pap smear within one year. When defendant suggested she have another, she "put it off." In February 1964 she consulted defendant for a cyst on her cheek and requested a prescription for birth control pills. In July 1966, defendant treated her for an upper respiratory infection and again for flu a few months later. In March 1968, she received treatment for asthma, and in January and March 1969 for a urinary tract infection. In addition, Mrs. Truman visited defendant several times when her children needed treatment and to discuss family problems.

During her visits, defendant and his staff repeatedly advised Mrs. Truman to have a complete physical examination, particularly a pap smear. On those occasions she either declined or put off their suggestions, limiting her requests to her most immediate health problems. Defendant never explained the purpose of a pap smear to Mrs. Truman believing that any intelligent woman of child bearing age was aware of its purpose.

Mrs. Truman died of cervical cancer in July 1970. At trial expert witnesses testified the disease is often curable if detected in its early stages.

Plaintiffs requested the jury be instructed that it "is the duty of a physician to disclose to his patient all relevant information to enable the patient to make an informed decision regarding the submission to or refusal to take a diagnostic test. [¶] Failure of the physician to disclose to his patient all relevant information including the risks to the patient if the test is refused renders the physician liable for any injury legally re-

sulting from the patient's refusal to take the test if a reasonably prudent person in the patient's position would not have refused the test if she had been adequately informed of all the significant perils."

## I. DUTY

A primary consideration in determining whether a new duty should be imposed upon a defendant is the "extent of the burden to the defendant and consequences to the community" in imposing the duty. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; *Coulter* v. *Superior Court* (1978) 21 Cal.3d 144, 153 [145 Cal.Rptr. 534, 577 P.2d 669]; *Lipman* v. *Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224, 229-230 [11 Cal.Rptr. 97, 359 P.2d 465].)

The burden of explaining the purposes of a pap smear and the potential risks in failing to submit to one may not appear to be great, but the newly imposed duty upon physicians created by today's majority opinion goes far beyond. The instruction requires disclosure of all "relevant information to enable the patient to make an informed decision regarding the submission to or refusal to take a diagnostic test." In short, it applies not only to pap smears, but to all diagnostic procedures allegedly designed to detect illness which could lead to death or serious complication if not timely treated.

Carried to its logical end, the majority decision requires physicians to explain to patients who have not had a recent general examination the intricacies of chest examinations, blood analyses, X-ray examinations, electrocardiograms, urine analyses and innumerable other procedures. In short, today's ruling mandates doctors to provide each such patient with a summary course covering most of his or her medical education. Most medical tests—like pap smears—are designed to detect illness which might prove fatal absent timely treatment. Explaining the purposes of each procedure to each such patient will obviously take hours if not days.

Few, if any, people in our society are unaware that a general examination is designed to discover serious illness for timely treatment. While a lengthy explanation may result in general examinations for some patients who would otherwise decline or defer them, the onerous duty placed upon doctors by today's decision will result in reduced care for others. Requiring physicians to spend a large portion of their time

teaching medical science before practicing it will greatly increase the cost of medical diagnosis—a cost ultimately paid by an unwanting public. Persons desiring treatment for specific complaints will be deterred from seeking medical advice once they realize they will be charged not only for treatment but also for lengthy lectures on the merits of their examination.

The great educational program the majority embark upon, even if justifiable, is a question of public policy for the Legislature to determine: whether the cost warrants the burden, and whether the duty to educate rests with doctors, schools or health departments. Requiring individual doctors to enlighten the public may be found through legislative hearings to be inefficient, not reaching those who need it most—the ones hesitant to consult doctors.

When a patient chooses a physician, he or she obviously has confidence in the doctor and intends to accept proffered medical advice. When the doctor prescribes diagnostic tests, the patient is aware the tests are intended to discover illness. It is therefore reasonable to assume that a patient who refuses advice is aware of potential risk.

Moreover, the physician-patient relationship is based on trust, and forcing the doctor into a hard sell approach to his services can only jeopardize that relationship.

The new duty to explain, imposed by the majority as a matter of law, creates an undue burden on both the doctor and society and should be rejected. Strict tort liability does not extend to professional services. The ordinary duty in medical practice cases calls for determining the community standard of care, the appropriate duty in the instant case. (*Barton* v. *Owen* (1977) 71 Cal.App.3d 484, 494-499 [139 Cal.Rptr. 494].) Doctors—or at least the Legislature—rather than judges are in the best position to balance the professional relationship between doctors and patients, to determine how far a doctor should go in selling his services without alienating the patient from all medical care, and to promote the highest level of diagnostic care for the community. In the instant case, evidence as to community medical standard was appropriately received, the case was tried on this basis, and we should not reverse the judgment.

Nothing in *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1] warrants imposition of such an onerous duty—to the con-

trary, that case expressly rejected any such duty. In *Cobbs*, a doctor performed risky ulcer surgery on a patient which resulted in severe complications. While the surgeon explained the nature of the operation to the patient, he did not discuss the inherent risks.

We pointed out that bodily intrusion is actionable either on the basis of battery or negligence unless the patient consents. (8 Cal.3d at pp. 239-241.) The court reasoned that because patients ordinarily are unlearned in medical science, an adult of sound mind "in the exercise of control over his own body" has a right to determine for himself whether to submit to proposed medical treatment, and that consent to intrusion must be informed to be effective. (8 Cal.3d at p. 242.) We held that the physician who ordinarily has superior knowledge had a "duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each." (8 Cal. 3d at pp. 242-243.)

In *Cobbs*, we expressly circumscribed the duty of the doctor, holding that a "mini-course in medical science is not required," that "there is no physician's duty to discuss the relatively minor risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence," that as to common procedures "no warning" is "required as to the remote possibility of death or serious bodily harm," and that recovery would be permitted only if a "prudent person in the patient's position" adequately informed of the perils would have declined treatment. (8 Cal.3d at pp. 244-245.)

Thus, *Cobbs* is not helpful to the majority because the duty of disclosure in that case was imposed to assure consent to the intrusion would be effective. When no intrusion takes place, no need for consent—effective or otherwise—arises.[1]

Furthermore, contrary to the express limitations in *Cobbs*, today's decision requires not only an explanation of the risks of a single procedure but also a "mini-course in medical science," if not a maxi-course. Simi-

---

[1]Like *Cobbs*, all other authority relied on by the majority (*Canterbury v. Spence* (D.C. Cir. 1972) 464 F.2d 772, 788; *Sard v. Hardy* (1977) 281 Md. 432, 444 [379 A.2d 1014]; *Wilkinson v. Vesey* (1972) 110 R.I. 606, 627 [295 A.2d 676, 69 A.L.R.3d 1202]; Waltz & Scheuneman, *Informed Consent to Therapy* (1970) 64 Nw. U.L.Rev. 628, 639-640), is concerned with whether consent to therapy was informed and therefore effective. The cases involve situations where there has been an intrusion to the body autonomy and it is claimed the intrusion was consensual. Thus, the question of informed consent is crucial. None involves the situation where the patient has refused the intrusion and thus consent is immaterial.

larly, because discovery of serious illness in a general examination of an apparently healthy person is remote, the doctor, contrary to *Cobbs*, is now required to disclose remote possibilities of illness. Moreover, the *Cobbs* duty to warn in cases where an adequately informed prudent person would have declined treatment shows a concern for preventing over-selling of services by physicians. By contrast, today's duty appears designed to increase selling of medical services.

## II. THE INSTRUCTION

A trial court has no duty to modify or edit an instruction offered by either side in a civil case. If the instruction is incomplete or erroneous the trial judge may, as he did here, properly refuse it. (*Shaw v. Pacific Greyhound Lines* (1958) 50 Cal.2d 153, 158 [323 P.2d 391]; *Tossman v. Newman* (1951) 37 Cal.2d 522, 525 [233 P.2d 1]; *Estate of Dopkins* (1949) 34 Cal.2d 568, 575 [212 P.2d 886]; *Nelson v. Southern Pacific Co.* (1937) 8 Cal.2d 648, 653 [67 P.2d 682]; *Ernest W. Hahn, Inc.* v. *Sunshield Insulation Co.* (1977) 68 Cal.App.3d 1018, 1024 [137 Cal. Rptr. 732]; *Anaheim Bldrs. Supply, Inc. v. Lincoln Nat. Life Ins. Co.* (1965) 233 Cal.App.2d 400, 413 [43 Cal.Rptr. 494].)

The majority opinion and the record reveal factual issues remain to be resolved even if the new duty is imposed. The offered instruction made no mention of those issues. Thus the instruction was deficient and erroneous. Moreover, as the trial court appropriately pointed out the instruction is confusing.

The majority recognize there exists "a question of fact for the jury" whether the risks resulting from refusal to have a pap smear would be known to a reasonable person. (*Ante*, p. 293.) But nothing in the proposed instruction would advise the jury that the duty to disclose was inapplicable and that liability should not be imposed if the jury found the risks were known to a reasonable person.

The majority also recognize there exists a question of fact whether Mrs. Truman would have taken the test had she been fully informed. (*Ante*, p. 294.) However, the jury was not advised of this question of fact. Rather, it was told that failure to disclose made the physician "liable for any injury legally resulting from the patient's refusal to take the test." The term "legally resulting" was not defined in the instruction or in any other instruction. While "proximate cause" was generally defined by another instruction and some lawyers might equate "legally result-

ing" with "proximate cause," there is little reason to believe that laymen would equate the two terms. Rather, laymen would anticipate that "any injury legally resulting" would refer to some technical rule of damages, allowing recovery for all injuries excepting certain ones.

Therefore, because the trial court is not required to correct instructions, refusal of the instruction furnishes no basis for reversal.

Before refusing the instruction, the trial judge indicated he was sympathetic to its theory but felt it confusing. He pointed out that a duty to disclose "all relevant" information was too broad, substituted "proximate cause" for "legally resulting," and made an effort to rewrite the last portion of the instruction to avoid confusing the jury. When his attempts at simplification failed, he advised counsel he would consider a revised version of the instruction. However, counsel presented no revision. The trial judge also pointed out that the jury would be instructed on general negligence and proximate cause principles, including the community standard of medical care.

The trial judge's observations were correct. The majority state that the burden is "significant" risks rather than "all relevant" information. (*Ante*, p. 293.) As demonstrated, "legally resulting" is confusing. A mere reading of the instruction shows how confusing the last portion is, and it would be more confusing to jurors who, unlike us, listen to but are not permitted to ponder a written draft.

Finally, conflicting evidence exists as to whether community medical standards required explanation of the risks inherent in refusing a pap smear. As noted above, the majority recognize that whether such explanation is required depends upon factual circumstances. Clearly, the issue was properly before the jury under standard negligence instructions, including instructions on community medical standards.

Refusal to give the requested instruction does not warrant reversal. I would affirm the judgment.

Richardson, J., and Manuel, J., concurred.

Respondent's petition for a rehearing was denied July 17, 1980. Clark J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.