[No. B026033. Second Dist., Div. Seven. July 7, 1989.]

ELIZABETH RAE SCALERE et al., Plaintiffs and Appellants, v. ROBERT E. STENSON, Defendant and Respondent.

COUNSEL

Paul F. Moore and Paul F. Moore II for Plaintiffs and Appellants.

Tuverson & Hillyard and Thomas E. Tootell for Defendant and Respondent.

OPINION

**WOODS (Fred), J.**—In this medical malpractice case appellant[1] claims instructional error regarding duty to disclose. We affirm.

### PROCEDURAL AND FACTUAL BACKGROUND

On June 25, 1980, appellant, then 46 years old, underwent a diagnostic surgical procedure, cardial catheterization (an angiogram) at the Hospital of the Good Samaritan. Respondent, a cardiologist specializing in such procedures, performed the angiogram on the brachial artery of appellant's right arm.

After surgery appellant reported pain and discomfort in her right arm. There was swelling and little, if any, pulse.

Respondent examined and tested appellant's right arm and concluded that it was progressing satisfactorily. He therefore neither told appellant about nor recommended any further diagnostic tests or therapy.

Approximately one year later appellant underwent a saphenous vein bypass of her right brachial artery with resultant damage.

On August 18, 1981, appellant filed a complaint alleging medical negligence. The defendants were respondent, another doctor, and the hospital.

---

[1] Plaintiffs-appellants are Elizabeth Rae Scalere, who was operated upon and suffered injury, and her husband Michael Scalere, who suffered a loss of consortium. For convenience we refer to Elizabeth Rae Scalere as appellant.

On December 11, 1986, a jury returned their verdict finding that none of the defendants were negligent in their "medical, hospital, nursing, diagnosis, care and treatment of plaintiff."

After filing the notice of appeal, appellant abandoned the appeal as to the other doctor and the hospital.

## CONTENTIONS

Appellant contends: 1. The court erred in not instructing on duty to disclose.

2. The court abused its discretion in excluding a patient information brochure.

3. The court abused its discretion in limiting the testimony of Dr. Phillip Marcus.

## DISCUSSION

1. *The court erred in not instructing on duty to disclose.*

■ Although appellant's complaint only alleged ordinary medical negligence ("negligently examined, diagnosed, prognosed, cared for, treated, and performed surgical procedures upon the body and person of plaintiff") at trial appellant sought to establish a second negligence theory, viz., that respondent had failed to disclose "material facts necessary for [appellant] to properly evaluate her condition and seek appropriate *post*-operative care." (Italics added.)

This duty to disclose theory, and appellant's requested jury instructions, were based upon four California cases. We discuss each.

*Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1] involved a doctor who explained the nature of duodenal ulcer surgery to his patient but did not inform him of the inherent risks of such surgery including a 5 percent risk of spleen injury. The patient "consented" to the ulcer surgery which caused spleen injury. *Cobbs* held that "as an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each." (*Id.,* at p. 243.) Thus, the predicate for the duty to disclose is some proposed therapy, in *Cobbs* duodenal ulcer surgery.

In the instant case respondent proposed no postsurgery therapy and therefore did not require appellant's informed (or uninformed) consent to any such therapy. The predicate for the *Cobbs* duty-to-disclose being absent, there was no duty to disclose.

In *Truman* v. *Thomas* (1980) 27 Cal.3d 285 [165 Cal.Rptr. 308, 611 P.2d 902] a family doctor recommended that Mrs. Truman, who he had treated for six years, have a pap smear but failed to inform her of the risks of *not* having one. Mrs. Truman did not follow the recommendation. When it was too late, a gynecologist discovered that she had inoperable cervical cancer. A sharply divided court held that Mrs. Truman's doctor had a duty to provide her with material information so that she could make an informed choice to accept or reject the medical procedure he had recommended. (*Id.,* at p. 291.) In *Truman* the predicate for the duty was not proposed therapy, as in *Cobbs,* but a recommended medical procedure.

In the instant case, not only did respondent propose no postsurgery therapy but respondent did not recommend any postsurgery medical procedure. Thus, the predicate for the *Truman* duty to provide material information being absent, there was no duty to provide such information.

In *Moore* v. *Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728 [223 Cal.Rptr. 859] an internist recommended that his patient see a specialist about the mole on his ear but failed to state the risk—failure to detect a cancer—in disregarding the recommendation. The patient disregarded the recommendation and only belatedly discovered that the mole was malignant. This court held in *Moore* that the doctor "had a duty to disclose . . . all material information which would enable Moore to make an informed decision whether to see the specialist or not." (*Id.,* at p. 738.) But our predicate, as in *Truman,* was a recommended medical procedure. We stated, "This is *not* a case in which no diagnostic testing was recommended. (Compare *Jamison* v. *Lindsay* (1980) 108 Cal.App.3d 223, 230-231 [166 Cal.Rptr. 443].) As Mason [the internist] testified, he told Moore the mole should be removed or studied microscopically so that it could be properly diagnosed." (Italics added.) (*Id.,* at p. 738, fn. 4.)

Unlike *Moore,* as we have stated, this *is* a case in which no diagnostic testing was recommended. Therefore, the predicate for the duty to disclose being absent, there was no duty to provide "material information."

Finally, in *Jamison* v. *Lindsay, supra,* 108 Cal.App.3d 223 plaintiff's gynecologist sent a sample of cystic material, removed during surgery, to defendant pathologist for examination and analysis. The pathologist determined that the sample contained both mature and immature tissue. Fur-

ther, the pathologist knew there were two divergent schools of thought among pathologists regarding such immature tissue with one school believing that the tissue was potentially malignant. But the pathologist, being of the other school, concluded that the tissue was benign. He so informed plaintiff's gynecologist (without informing him about either the immature tissue or the divergent view of other pathologists) who informed plaintiff.

Some months later a malignant tumor was discovered at the cyst removal situs. Plaintiff sued the pathologist and her gynecologist not only for negligence but for "a lack of informed consent." (108 Cal.App.3d at p. 229.)

*Jamison* affirmed the judgment for defendants and found plaintiff's informed consent theory inapplicable and her proposed instructions based upon that theory properly refused. The court stated, "Appellant had validly consented to the surgery before anyone knew anything about the characteristics of the suspected tumor. After the surgery, respondents did not propose any therapy as to which appellant would have been entitled to make an informed decision." (108 Cal.App.3d at p. 230.)

But *Jamison,* in dictum, went on to fashion "an appropriate instruction." (108 Cal.App.3d at p. 231.) Appellant requested this[2] and other duty to disclose instructions[3] and claims their denial to be error.

Assuming the *Jamison* dictum to be correct,[4] it merely indicates that the instruction was appropriate to its facts. Those facts contained the "two schools of thought" predicate absent in the instant case. Respondent had concluded that appellant's postsurgery condition was satisfactory and required neither further diagnosis nor treatment. Respondent, unlike the pathologist in *Jamison,* knew of no other "school of thought" that might have come to a conclusion different from his own.

---

[2] "[I]t is the duty of a physician or surgeon to disclose to the patient all relevant information to enable the patient to make an informed decision whether to seek additional treatment following surgery." (*Id.,* at p. 231.)

[3] Although the 11 instructions appended to appellant's opening brief each indicate "requested by plaintiff" and have a mark or check in the refused box with the trial judge's initials, C.V., on the judge's signature line, only one (BAJI 6.11, modified) appears to be included among the list of appellant's proposed instructions filed with the trial court. Moreover, during the extensive instruction discussions with the trial court appellant appears to have rescinded her request for all but one duty to disclose instruction. During these discussions counsel for respondent stated, without contradiction or dissent, that "all parties have agreed, as has the Court, that the BAJI instructions of informed consent, 6.11 and 6.11.5, are not applicable to this matter which has resulted in the special instruction [apparently the *Jamison* instruction] being drafted on behalf of Mrs. Scalere." The *Jamison* instruction, alone, is an inadequate and misleading description of a duty to disclose.

[4] Although decided almost nine years ago, as of April 1, 1989, it has been cited by California appellate courts only four times.

The dissent concludes otherwise. It finds authority in *Cobbs* v. *Grant* for its dispositive proposition that "[w]hether the physician's recommendation is to treat or not to treat, the risks and benefits involved in each course must be explained to the patient. The weighing of these risks is not the doctor's function. 'Such an evaluation and decision is a non-medical judgment reserved to the patient alone.' (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 243.)" (Dissent, *post,* at p. 1456.) We find no such authority.

*Cobbs*'s holding is inextricably linked not to nontreatment, as in the instant case, but to proposed therapy. It states, ". . . we hold, as an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices *with respect to proposed therapy* and of the dangers inherently and potentially involved in each." (*Cobbs* v. *Grant, supra,* 8 Cal.3d 229, 243. Italics added.)

Moreover the sentence quoted from *Cobbs* by the dissent, rather than occurring in the "non-treatment" context the dissent implies, is extracted from a *treatment* context. An accurate portrayal of that context is conveyed by this opening sentence: "A medical doctor, being the expert, appreciates the risks inherent *in the procedure he is prescribing,* the risks of a decision not to undergo the treatment, and the probability of a successful outcome of the treatment." (8 Cal.3d at p. 243.) (Italics added.)[5]

Conversely, the dissent, in its reading of the record, fails to find disclosures by respondent that we readily find. (Dissent, *post,* at p. 1460.) The dissent states respondent did not disclose to appellant that "[b]lood clots are a common complication after an angiogram." (Dissent, *post,* at p. 1459.) But appellant testified she received from respondent a patient information brochure co-authored by respondent which, as she read aloud to the jury, states "[o]ccasionally, perhaps one in a hundred times, the artery in spite of proper technique will clot at the site of the catheter insertion. . . ."

The dissent also states respondent failed to disclose that "[i]f a blood clot exists it is advisable to perform a thrombectomy soon after the angiogram." (Dissent, *post,* at p. 1458.) But the just-quoted sentence continues "and may need to be re-explored. This is done by the vascular surgeons."

---

[5] The pertinent part of the paragraph reads: "A medical doctor, being the expert, appreciates the risks inherent in the procedure he is prescribing, the risks of a decision not to undergo the treatment, and the probability of a successful outcome of the treatment. But once this information has been disclosed, that aspect of the doctor's expert function has been performed. The weighing of these risks against the individual subjective fears and hopes of the patient is not an expert skill. Such evaluation and decision is a nonmedical judgment reserved to the patient alone." (*Ibid.*)

Further, the dissent states respondent had a duty to disclose to appellant that a thrombectomy "was a reasonable option."[6] (Dissent, *post,* at p. 1458.) But respondent could hardly "disclose" what he did not believe. Respondent made clear that "it was my opinion . . . that she did not need a vascular surgeon, she did not need a thrombectomy."

The dissent would draw a new duty-to-disclose line. Though a doctor proposes neither surgery nor medical procedure, though he recommends no therapy and is unaware of any other school of doctors who would recommend therapy, the dissent would require such a doctor to disclose "the risks and benefits of non-treatment."

Such a line, like one drawn with a finger in the air, is without precision and predictability. It would impose significant new burdens on already harried doctors without awarding demonstrable benefits to their patients.

"It seems obviously prohibitive and unrealistic to expect physicians to discuss with their patients every risk of proposed treatment[7] —no matter how small or remote—and generally unneccessary from the patient's viewpoint as well." (*Canterbury* v. *Spence* (D.C. Cir. 1972) 464 F.2d 772, 786 [150 App.D.C. 263].)

We find no error in the trial court's refusal to give appellant's requested duty to disclose instructions.

■ Of course, as the court said in *Jamison,* "Appellant was not without an appropriate legal theory under which she might recover damages. Negligent failure to advise a patient to pursue a potentially necessary course of treatment is actionable under ordinary medical negligence standards. . . ." (*Jamison* v. *Lindsay, supra,* 108 Cal.App.3d 223, 231.)

*2. The court abused its discretion in excluding a patient information brochure.*

■ Sometime before her June 25, 1980, angiogram appellant received a "Patient Information On Cardiac Catheterization" brochure which respondent had co-authored.

At trial, portions of the brochure were recited by appellant to the jury. During one of these recitations counsel discovered that there were two

---

[6] The dissent relies on respondent's answer to a hypothetical question *not* descriptive of appellant's condition, viz, an occluded brachial artery.

[7] Let alone *non*treatment.

slightly different brochures. Appellant was unable to determine which of the two she had received.

Appellant claims it was error for the court to exclude the brochure appellant received. But not only was appellant unable to identify which of the two different brochures she received but appellant, in violation of California Rules of Court, rule 15,[8] fails to cite where in the record she made a motion to admit the brochure into evidence. Our search discerns no such motion.

Appellant has failed to establish any abuse of discretion by the trial court.

3. *The court abused its discretion in limiting the testimony of Dr. Phillip Marcus.*

■ Appellant's expert witness, Dr. Robert Carroll, testified to the standard of care a vascular surgeon would use in the relevant circumstances. When appellant sought to have another expert witness, Dr. Phillip Marcus, testify to the same matter, the court prohibited that testimony but allowed Dr. Marcus to testify about any "area that hasn't been gone into." The same ruling applied to respondent's expert witnesses.

The court properly exercised its discretion under Evidence Code section 723 ("The court may, at any time before or during the trial of an action, limit the number of expert witnesses to be called by any party." See *Horn* v. *General Motors Corp.* (1976) 17 Cal.3d 359, 371 [131 Cal.Rptr. 78, 551 P.2d 398]) and section 352 of the Evidence Code ("The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time. . . ."). There was no error.

DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent.

Lillie, P. J., concurred.

**JOHNSON, J.,** Dissenting.—I agree with the majority that the trial court did not abuse its discretion in excluding the patient information brochure or in limiting the testimony of Dr. Marcus. However, I disagree with the

---

[8] "The statement of any matter in the record shall be supported by appropriate reference to the record."

majority's holding Ms. Scalere was not entitled to submit to the jury her instruction on a doctor's duty of disclosure.

The issue is whether Dr. Stenson owed Ms. Scalere a duty to disclose the risks and benefits of his proposal not to treat her for a possible blood clot in her arm. As I will explain below, a doctor's duty of disclosure includes the duty to explain the risks and benefits of nontreatment. That duty arose in this case because there was medical evidence suggesting to Dr. Stenson a blood clot existed in Ms. Scalere's arm and that a thrombectomy was a viable option.

## I. A DOCTOR'S DUTY OF DISCLOSURE INCLUDES DISCLOSING THE RISKS AND BENEFITS OF NOT TREATING THE PATIENT.

The typical disclosure case involves the doctor's proposal that a particular treatment, operation, or test be performed.[1] Early disclosure cases were based on a battery theory. The doctor's failure to disclose sufficient information to the patient resulted in a battery either because the patient had not consented to the particular treatment performed or the failure to disclose vitiated the consent obtained from the patient. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 240.) Under a battery theory the doctor's failure to disclose the risks and benefits of nontreatment would not be actionable because there was no unconsented touching. (See Shultz, *From Informed Consent to Patient Choice: A New Protected Interest* (1985) 95 Yale L.J. 219, 229-230.)

The modern view, adopted in California, is to treat a doctor's failure to disclose relevant information as negligence. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at pp. 240-241.) Under this view, the purpose of disclosure is not to protect the patient from an unconsented touching but rather to protect the broader right of the patient to self-determination over what is done with her own body. As our Supreme Court stated, paraphrasing Justice Cardozo, "a person of adult years and in sound mind has the right, in the exercise of control over his own body, to determine whether or not to submit to lawful medical treatment." (*Id.* at p. 242; and see *Schloendorff* v. *Society of New York Hospital* (1914) 211 N.Y. 125 [105 N.E. 92, 93] [Cardozo, J.].) On the basis of this and other related postulates, the Supreme Court held, "as an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each." (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 243.)

---

[1] See, e.g., *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1]; *Truman* v. *Thomas* (1980) 27 Cal.3d 285 [165 Cal.Rptr. 308, 611 P.2d 902]; *Moore* v. *Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728 [223 Cal.Rptr. 859].

In order to effectively exercise her right of self-determination, the patient is entitled to "the amount of knowledge a patient needs in order to make an informed choice. All information material to the patient's decision should be given." (*Truman* v. *Thomas, supra,* 27 Cal.3d at p. 291.) Under this rule, the patient must be apprised of both the risks inherent in treatment and the risks of a decision not to undergo treatment. (*Id.* at p. 291.)

It is clear from *Cobbs* and *Truman* the patient's right of choice is not limited to a veto power over treatment recommended by her doctor. "The duty to disclose was imposed in *Cobbs* so that patients might meaningfully exercise their right to make decisions about their own bodies. . . ." (*Truman* v. *Thomas, supra,* 27 Cal.3d at p. 292.) Whether the physician's recommendation is to treat or not to treat, the risks and benefits involved in each course must be explained to the patient. The weighing of these risks is not the doctor's function. "Such evaluation and decision is a nonmedical judgment reserved to the patient alone." (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 243.)

The argument no duty to disclose arises unless the doctor proposes treatments or tests was rejected in *Jamison* v. *Lindsay* (1980) 108 Cal.App.3d 223 [166 Cal.Rptr. 443]. In *Jamison* a surgeon removed an ovarian tumor and sent it to a pathologist for evaluation. The pathologist examined the tumor and discovered it contained both mature and immature tissue. The pathologist was aware of two schools of thought on whether the presence of immature tissue indicates possible malignancy. As this pathologist belonged to the "non-malignant" school, he reported to the surgeon the tumor was benign. He did not inform the surgeon of the existence of immature tissue or that some pathologists believed such tissue to be potentially malignant. Because he was told the tumor was benign, the surgeon recommended no further tests or treatment to Ms. Jamison. Ms. Jamison later developed a malignant tumor which expert testimony linked to malignancy of the tumor declared benign by the pathologist.

One theory of liability in *Jamison* was that the surgeon and pathologist breached the duty of care by failing to inform plaintiff the tumor contained immature tissue and that some pathologists believed such tissue to be malignant or potentially malignant. Defendants argued that *Cobbs* and *Truman* were inapplicable because defendants did not propose any treatment and, therefore, there was nothing for Ms. Jamison to make a decision about. The appellate court agreed this was not the typical "informed consent" case and therefore the trial court properly rejected the requested instructions on

informed consent.[2] (108 Cal.App.3d. at pp. 230-231.) However, the court did not accept defendants' argument a duty to disclose only arises when some affirmative treatment is proposed. "Consistent with the broad duty of disclosure suggested by *Truman,* an appropriate instruction would have been, 'it is the duty of a physician or surgeon to disclose to the patient all relevant information to enable the patient to make an informed decision whether to seek additional treatment following surgery.'" (*Id.* at p. 231.)[3]

The duty of disclosure is triggered by the doctor's possession of material information not by proposed physical contact with the patient, as the court in *Jamison* correctly concluded. *Cobbs, Truman* and *Jamison* stand for the proposition that even if the doctor recommends no treatment he must still disclose what he knows about the patient's condition and prospects. "Although the patient is not more competent in making judgments assessing the likelihood of a particular disease, she is more competent in deciding whether she wishes to undergo more tests and spend more money in order to be more certain about the diagnosis in her case." (Shultz, *supra,* at p. 244.)

## II. BASED ON THE EVIDENCE PRODUCED AT TRIAL IT WAS ERROR NOT TO GIVE THE DISCLOSURE INSTRUCTION MS. SCALERE REQUESTED.

A litigant is entitled to an instruction on every theory she advances which is supported by the evidence. (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 543 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158].)

Ms. Scalere requested the jury be instructed, "It is the duty of a physician or surgeon to disclose to the patient all relevant information to enable the patient to make an informed decision whether to seek additional treatment following surgery." This instruction was taken verbatim from *Jamison* v. *Lindsay, supra,* 108 Cal.App.3d at p. 231.)

The question of what constitutes "relevant information" was addressed in *Truman* v. *Thomas, supra,* in which the court explained the doctor's duty as follows: "The scope of a physician's duty to disclose is measured by the amount of knowledge a patient needs in order to make an nformed choice.

---

[2] The narrow issue in *Jamison* was whether the trial court erred in refusing to give Ms. Jamison's requested instructions on informed consent. (*Id.* at p. 229.) The requested instructions are not set out in the opinion but from the court's description at pages 230-231 it appears they were BAJI Instructions Nos. 6.10 and 6.11 which, by their language, apply to cases involving treatments or operations. Because the doctors did *not* propose an operation or treatment the instructions, taken literally, were not applicable to the evidence presented. (*Id.* at p. 231.)

[3] This was the instruction requested by Ms. Scalere in the case before us.

All information material to the patient's decision should be given. . . .[¶] Material information is that which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject the recommended medical procedure." (27 Cal.3d at p. 291, citations omitted.)

In the case before us, the evidence shows Dr. Stenson decided against treatment for a possible blood clot without disclosing to Ms. Scalere: (1) Dr. Stenson suspected the existence of a blood clot two days after Ms. Scalere's surgery;[4] (2) If a blood clot exists it is advisable to perform a thrombectomy soon after the angiogram;[5] (3) A thrombectomy for a patient exhibiting Ms. Scalere's symptoms was a reasonable option.[6]

A jury could have properly found the foregoing information "would have been regarded as significant by a reasonable person" in Ms. Scalere's position and that Dr. Stenson breached his duty of care in failing to disclose it.

Dr. Stenson argues his failure to advise Ms. Scalere about the option of having a thrombectomy was based on his belief she did not have a blood clot. Because he did not believe she had a blood clot, there was no point in discussing blood clot treatments. If he was negligent, it was in failing to properly diagnose Ms. Scalere's condition not in failing to inform her of treatment options.

Dr. Stenson's argument does not fit the evidence produced at trial. The evidence could support a finding Dr. Stenson believed Ms. Scalere was suffering from a blood clot but that it was improving and, therefore, a

---

[4] See testimony of Dr. Stenson quoted *post,* page 1459.

[5] A jury could find the statement in the brochure that "occasionally" the artery will clot "and may need to be re-explored" by a vascular surgeon too vague to satisfy the duty of "reasonable disclosure of the available choices" once a blood clot is actually suspected. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 243.) For example, the statement does not disclose the need for prompt intervention in the case of a clot nor the consequences of not acting promptly to perform a thrombectomy.

[6] The following colloquy took place on cross-examination of Dr. Stenson:

"Q. If you thought that the brachial artery was occluded but did not see these symptoms that you have just described, you would refer her for a thrombectomy, would you not?

"A. If I did not see any symptoms, is that correct?

"Q. Yes.

"A. And there was a pulse? [¶] I think doing a thrombectomy is totally optional. [¶] Now, *one of the reasons people do thrombectomies is because of situations such as this one.* It becomes quite optional, and there are many situations in which arteries have been tied off or ligated around the brachial artery, above the brachial artery, below the brachial artery. There have been many situations in which pulses have been left diminished, and it is somewhat optional unless the patient is symptomatic from that particular vascular insufficiency; it is somewhat optional as to whether you do a thrombectomy." (Italics added.)

There was no objection to the hypothetical posed to Dr. Stenson.

thrombectomy or other treatment was not necessary. Dr. Stenson testified as follows:

"Q. Now, you suspected a partial blood clot per your testimony at least on the 27th, two days after the procedure?

"A. That's correct. [¶] Whatever the etiology was, whether it was spasm or whether it was the intima, inside lining of artery, being roughened up and leading to clot formation, it didn't seem to make much difference. [¶] But *I did believe there was clot formation of some degree.*

"Q. And in your experience and training, you knew that blood clots will either lyse, disappear, or propigate [*sic*] and occlude?

"A. If you're talking about blood clots in general, they tend to improve. [¶] A relatively small percentage of them, and particularly ones with flow around them, propigate [*sic*]. It's quite a small percentage. [¶] And *what I had was a sequence of events in which this clot seemed to be improving* and the blood flow seemed to be improving." (Italics added.) Even if Dr. Stenson only suspected the existence of a blood clot that suspicion was enough to trigger a duty to disclose the possibility of a blood clot and the risks and benefits of treatment versus nontreatment. A doctor need not be 100 percent sure of the patient's condition before the duty to disclose arises. In *Truman v. Thomas, supra,* the physician's liability was based on his failure to inform his patient of the risks in not having a pap smear. The court observed that "[a]lthough the probability that Mrs. Truman had cervical cancer was low, Dr. Thomas knew that the potential harm of failing to detect the disease at an early stage was death." (27 Cal.3d at p. 293.) In *Moore v. Preventive Medicine Medical Group, supra,* the defendant doctor discovered a very small skin lesion on plaintiff's ear. The doctor did not diagnose the lesion but strongly recommended plaintiff see a specialist. The patient delayed seeing a specialist which resulted in disfiguring surgery later on. Even though defendant did not suspect the lesion on plaintiff's ear was cancerous, the court held he was under a duty to disclose the risk if the patient failed to undergo the proposed testing. (178 Cal.App.3d at p. 739.)

This is not a case where a doctor failed to tell a patient with a headache about the risks and benefits of a brain scan. In this case there was a reasonable probability a blood clot existed based on the facts known to Dr. Stenson. These included the fact Ms. Scalere had some, but not all, of the symptoms of a blood clot; the fact that blood clots are a common complication after an angiogram; and the fact that a thrombectomy on a patient with Ms. Scalere's symptoms is a recognized option in the medical community.

A jury could reasonably find this option should have been discussed with Ms. Scalere.

The facts in this case amply demonstrate why a patient such as Ms. Scalere should not have been limited to a cause of action for misdiagnosis. The inherent uncertainty of medical judgment may excuse a misdiagnosis if the judgment was carefully and reasonably made. But such uncertainty should not excuse the failure to disclose information that would have allowed the patient to make a choice whether to opt for treatment. Indeed, the more uncertain the medical judgment, the more reason to leave the decision to the patient. (Shultz, *supra,* 95 Yale L.J. at p. 241.)

A petition for a rehearing was denied August 4, 1989. Johnson, J., was of the opinion that the petition should be granted.