Filed 6/26/18; pub. order 7/13/18 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ANGELA BELFIORE-BRAMAN et al., Plaintiffs and Appellants, v. D.  DANIEL ROTENBERG, M.D., Defendant and Respondent. | D072015 (Super. Ct. No. 37-2014-00022910-CU-MM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan M. Lewis, Judge.  Affirmed.

Miller & James, David D. Miller and Patricia I. James for Plaintiffs and Appellants.

Neil, Dymott, Frank, McFall, Trexler, McCabe & Hudson, Clark R. Hudson, David P. Burke and Elizabeth A. Harris for Defendant and Respondent.

Plaintiffs and appellants Angela Belfiore-Braman and Stephen Braman (sometimes together Plaintiff) appeal a defense judgment entered on a jury verdict, in

their medical malpractice action against defendant and respondent D. Daniel Rotenberg, M.D. (Defendant), an orthopedic surgeon.  The jury found Defendant was not negligent in the care and treatment of Ms. Belfiore-Braman during the hip replacement surgery he performed on her, and accordingly, it did not answer the special verdict's question on whether such negligence was a substantial factor in causing injury to her, or loss of consortium to her husband and fellow plaintiff.

The issues on appeal center around the trial court's ruling in limine, after a hearing under Evidence Code[1] section 402, that excluded certain medical opinion testimony Plaintiff offered on issues of causation and damage, from her recently designated nonretained expert witness Dr. Aaron G. Filler, M.D., Ph.D. ("Dr. Filler").  The court determined that the proposed testimony would be unduly duplicative within the meaning of section 723 (allowing the court to limit the number of expert witnesses to be called by any party).  Instead, the nonretained expert witness would be allowed to testify to the jury only as to his observations from an imaging study he performed and what the test results revealed to him about Plaintiff's condition.[2]

Plaintiff now argues this ruling in limine unfairly prevented her from making a showing that Defendant's alleged negligent acts were a substantial factor in causing her injuries.  (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th

---

[1]     All further statutory references are to the Evidence Code unless noted.

[2]     A "nonretained expert" is an occupational expert, such as a treating physician, police officer, or others who might testify as an expert but whose opinions are formed as part of normal occupational duties.  (*Gonzales v. Windlan* (Colo. App. 2014) 411 P.3d 878, 884.)

1108, 1118 (*Jennings*) [substantial factor test requires plaintiff to prove cause-in-fact].) However, we conclude the record supports the ruling. Plaintiff cannot show the trial court abused its discretion in precluding the offered testimony on causation and damage. (*Id.* at p. 1119, fn. 9 [abuse of discretion standard applies to admissibility of an expert's opinion on causation].) We affirm the judgment and its underlying ruling in limine.

I

*BACKGROUND FACTS; DESIGNATION OF EXPERTS*

Plaintiff was injured in an accident in 2006. In 2012, she consulted Defendant, who diagnosed her with moderate to severe arthritis of the left hip. She initially received nonsurgical treatments, and on April 23, 2013, he performed a left total hip replacement surgery. After surgery, she complained of numbness in both legs, left greater than right. Her left-sided symptoms persisted and Defendant concluded she had left-sided nerve irritation (neuropraxia).

At Plaintiff's final visit with Defendant in March 2014, she reported some of her symptoms had improved, but she was still experiencing lower limb weakness, pain, and sensation abnormalities, including a drop foot condition. On July 18, 2014, her amended

complaint was filed against Defendant, as well as others who were dismissed prior to or during trial.[3]

Defendant filed an answer and discovery began. For the expert witness exchange in September 2015, Plaintiff designated as her expert Dr. Eric Meinberg, a board certified orthopedic surgeon, for testimony on "all issues regarding standard of care, causation and damages." She also identified a number of treating doctors and nonretained experts, including her primary care provider Dr. Consuelo Ocampo. It is not disputed that Defendant designated Dr. Craig Swenson, also a board-certified orthopedic surgeon, on standard of care and related issues.

In the spring of 2016, Dr. Ocampo referred Plaintiff to Dr. Filler's office for an MR neurography study. The results of this May 18, 2016 imaging study were sent to Dr. Ocampo and Plaintiff in June 2016, and forwarded to her attorney. Consistent with his imaging practice, Dr. Filler did not meet with or speak to Plaintiff during the study.

Plaintiff's "Amended" First Expert Exchange was served in July 2016, disclosing that she had recently undergone the study with Dr. Filler.[4] She also disclosed a new treating doctor, Dr. Robert C. Pace, and added him and Dr. Filler to her list of "treating

---

[3]    The elements of Plaintiff's medical negligence cause of action allege "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." (*Turpin v. Sortini* (1982) 31 Cal.3d 220, 229-230.)

[4]    It does not appear that the motion procedure for augmenting a party's expert witness list was utilized here. (Code Civ. Proc., § 2034.610.)

health care providers/non-retained experts to testify regarding the issues of standard of care, treatment, diagnosis, prognosis, causation and why and how [she] was injured or damaged as claimed." Dr. Meinberg was still the only designated Plaintiff's expert.

Defendant promptly took Dr. Filler's deposition. He understood he was not designated as an expert in this case, and testified during the deposition that over his career, he had seen about 20 patients who had a sciatic problem after hip surgery. Sciatic nerve problems can stem either from trauma or a condition called piriformis syndrome, in which the nerve running through the piriformis muscle can become torn, irritated, or pinched.

From the nerve imaging study Dr. Filler performed for Plaintiff, he believed there were several possible causes for the sciatic nerve entrapment he observed. He attributed it to an improper placement of the retractor during the hip replacement surgery, leading to direct injury to the nerve, or possibly other types of mechanical pulling, catching, or burning that injured the sciatic nerve. Dr. Filler's neurosurgery practice does not include performing total hip replacements. In conducting his study, he did not review Defendant's medical records or the operative report from the surgery. He could not say precisely what happened at the time that must have caused the neurologic symptoms.

II

*TRIAL AND VERDICT*

A. Introduction

After taking Dr. Filler's deposition, Defendant filed a motion in limine to preclude him from testifying at trial, in part because he did not perform such surgery and had not

5

reviewed the operative notes. Defendant also argued his opinions only established possibilities about the cause of injury, rather than probable causes. (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 ["Mere possibility alone is insufficient to establish a prima facie case."].)

Plaintiffs opposed the motion and submitted Dr. Filler's declaration in support of the medical and legal validity of his imaging study, generally and as performed on Plaintiff.[5]

When trial began in December 2016, the court heard and ruled on other motions in limine, but deferred ruling on the motion to exclude Dr. Filler's expert testimony until a section 402 evidentiary hearing was held. We examine the subsequent ruling for whether the record indicates the court abused its discretion by preventing Plaintiff from fully and fairly setting forth her evidentiary presentation on her theory of the case. (*Monroy v. City of Los Angeles* (2008) 164 Cal.App.4th 248, 266-267 (*Monroy*); *Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1432; §§ 723, 352.) The court's evidentiary rulings must not "undercut a plaintiff's case by preventing that party from presenting evidence in an organized and coherent way." (*Monroy, supra,* at pp. 267.)

---

[5]    Originally, Defendant's motion challenged whether MR neurography, the type of imaging study invented, ordered and reviewed by Dr. Filler, is generally accepted as reliable within the scientific community. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 772, fn. 6 (*Sargon Enterprises*) ["general acceptance" test for admissibility of expert testimony based on new scientific techniques applies in California]; *People v. Kelly* (1976) 17 Cal.3d 24.) However, Defendant conceded that point during the section 402 hearing, and no such issue is before us on appeal. The record on appeal has been augmented to include Dr. Filler's declaration in support of his methodology and his conclusions.

With these standards in mind, we generally outline the medical testimony presented at trial, with attention to the elements specified in the special verdict form. The jury was required to determine whether a breach of the professional's duty of care occurred, before it reached the question of a causal connection between any negligent conduct and the resulting injury. (*Turpin v. Sortini*, *supra*, 31 Cal.3d 220, 229-230.)

## B. Plaintiff's Case

Plaintiff presented her own testimony about the surgery and her condition before and afterwards. Her husband and coplaintiff likewise testified. She then offered testimony from her designated orthopedic surgery expert, Dr. Meinberg, on the standard of care, causation, and damages. He explained the surgery method used here was a posterior approach to the hip, in which an incision was made and the muscles in the area, including the piriformis, were parted before the replacement components could be inserted. In his opinion, Defendant had failed to meet the applicable standard of care, particularly because the surgery resulted in nerve damage and a length discrepancy in Plaintiff's limbs. Possible difficulties at surgery included the question of whether the replacement hip components were too tight, causing problems in placement (in getting the hip reduced and impacting the sciatic nerve).[6]

With regard to the position of a patient's hip and knee during hip replacement surgery, Dr. Meinberg testified it can affect the sciatic nerve, and the retractors used can

[6]     As used in surgery, the term "reduced" means "[t]o set (a broken bone); to restore (esp. a dislocated, fractured, or herniated part) to a normal anatomical position." (OED Online, Oxford University Press, www.oed.com/view/Entry/160503 "reduce, v.," June 25, 2018.)

stretch and bruise the nerve, resulting in sciatic nerve injury. Dr. Meinberg reviewed Defendant's operative report and was unable to determine whether or how Plaintiff's position during surgery had caused her problems, but said that generally, sciatic nerve injury will occur when the nerve is either stretched or malpositioned too long. Dr. Meinberg concluded from the evidence he reviewed that the nerve must have been stretched too much, there was a clear cause and effect, the injury was not spontaneously arising (idiopathic), and the surgery performance was a substantial factor in contributing to the ultimate injury. He believed that Plaintiff's injury was a combination of the leg length discrepancy (one centimeter) along with how other protocols were used during surgery.

During cross-examination, Dr. Meinberg agreed that even if this type of surgery is performed perfectly, with optimal positioning, risks can still include nerve damage and/or limb length discrepancy. During surgery, an orthopedist ordinarily will not search for the sciatic nerve, because such a search could cause injury to it. The orthopedic community considers it acceptable if there is a postoperative limb length discrepancy of two centimeters or less, such as Plaintiff has.

## C. Ruling In Limine

After the two days of trial outlined above, the court returned to the section 402 hearing on the extent to which Dr. Filler could testify at trial. Defendant argued that the offered opinions about possible causes of Plaintiff 's nerve injury were speculative, irrelevant, and unduly prejudicial, and Dr. Filler had not been properly designated as an expert.

8

In response, Plaintiff submitted Dr. Filler's declaration filed before trial, in support of his scientific evidence as it would relate to Plaintiff. (See fn. 5, *ante;* the declaration cites many other court cases in which this technology has been accepted.) With regard to Plaintiff's individual case, Dr. Filler gave the opinion that the type of imaging he performed could support reasonable circumstantial inferences about how she was harmed. He detected that her sciatic nerve was severely injured in a location closely adjacent to where Defendant was working. His deposition testimony had listed a series of extraordinary mechanical events that could have caused such an injury, through the actions of the surgeon. His declaration stated that causation could be shown by his information as to proximity and type of injury, since only Defendant had been applying force or controlling the actions of others, in the location where this occurred. Moreover, Dr. Filler's observations showed that the tissues overlying the sciatic nerve showed no evidence of trauma, except for the surgical incision. To a reasonable degree of medical certainty, "more probable than not," his opinion was that Plaintiff's neurological deficit was due to an injury to the sciatic nerve that was caused by Defendant during the surgery. He believed that the type of injury he observed in Plaintiff's study was only compatible with negligence.

The court then heard testimony from Dr. Filler, explaining he reviewed the defense motion in limine and Plaintiff's opposition to it, in preparation for the section 402 hearing. He did not personally see Plaintiff as a patient when she came in for the MR neurography testing, which is consistent with his custom and practice for imaging patients. His study revealed her sciatic nerve was not severed, but it was compressed and

9

distorted. He formed the impression that during surgery, a significant and excessive degree of mechanical force was applied to the nerve, sufficient to injure it severely. This was "[m]ost likely, either a misplaced retractor or the hip joint element slipping and crushing the nerve during the course of trying to assemble it." He believed that to a reasonable degree of medical certainty, the nerve injury was causally connected to the surgery.

Dr. Filler does not perform hip replacements as part of his practice. He could not quantify the amount of force which would injure the sciatic nerve during surgery, except to say it must have been more than the nerve could tolerate. Other than interpreting the study and recommending a treatment plan, he did not perform any treatment for Plaintiff.

Even though Defendant was no longer contesting the reliability of Dr. Filler's imaging technology, he continued to argue that the proposed testimony was inadmissible because it would amount to duplicative expert opinion testimony. As Plaintiff's expert, Dr. Meinberg had already testified on standard of care and causation, and Defendant objected to Dr. Filler also testifying on causation or how he thought Defendant breached the standard of care. Defense counsel further argued Dr. Filler was not a treating physician, because Plaintiff could not show she met with him or that his study was ever used in her treatment.

Plaintiff responded that Dr. Filler's analysis remained relevant on issues of substantial factor causation, as well as treatment, so the jury should hear his testimony. Having reviewed Dr. Filler's declaration and deposition, the trial court granted the defense motion in limine in part, to disallow Dr. Filler from testifying to the jury about

10

anything beyond what he had learned from the diagnostic tool and its test results. Plaintiff would therefore not be allowed to provide his testimony to show causation of injury and damages, because Plaintiff had already designated an orthopedic surgeon as her expert on those topics and duplicative testimony was inappropriate. (§ 723.)

Further, the court found that Dr. Filler did not qualify as a "treating" doctor, since there was no showing his study had been used for her treatment. (See *Schreiber v. Estate of Kiser* (1999) 22 Cal.4th 31, 36 (*Schreiber*) ["A treating physician is not consulted for litigation purposes, but rather learns of the plaintiff's injuries and medical history because of the underlying physician-patient relationship."])

However, the court permitted Dr. Filler to give testimony that described the imaging study he performed and its results, including his observations that the sciatic nerve was compressed or distorted. Dr. Filler told the jury that the study he performed showed that her sciatic nerve was not severed, but it was "very distorted in shape just as it went past the hip replacement location." On cross-examination, Dr. Filler testified the study showed Plaintiff's sciatic nerve went through her piriformis muscle.

### D. Defense Case; Verdict

At the next day of trial, Defendant testified on his own behalf. Before Plaintiff's surgery, he had discussed with her the risks and benefits associated with the surgery, including the potential risk of injury to the many nerves in the area and the risk of leg length discrepancy. During the surgery, Defendant used a posterior approach and standard techniques to minimize the risk of nerve compression or stress, such as protecting the nerves and positioning the hip and patient in certain ways. He used

11

fluoroscopy to ensure the hip replacement components were in the correct position. Several trial components were used before he placed the final hip replacement components in the body. It was necessary to exert some physical force by pulling on the leg "to make sure that the hip doesn't spontaneously dislocate because that's one of the bigger complications that can go on." He found that one trial component was a little too tight, and therefore used another, which he thought looked and worked great. He did not identify any complications occurring during surgery.

Defendant took a postoperative full length x-ray, which showed that Plaintiff's limb length discrepancy was less than one centimeter. Defendant believed that he met the applicable standards of care during Plaintiff's surgery and her postoperative treatment. In his opinion, nerve injury of this type can still occur even if the surgery is performed perfectly, and Plaintiff's nerve injury was spontaneously arising or idiopathic in nature. He did not know why her condition improved after surgery, but then stopped improving.

The defense orthopedic surgery expert, Dr. Swenson, reviewed the records and concluded that Defendant had complied with the standards of care applicable to performing surgery and rendering postoperative care. There were many mechanisms, such as pulling too hard, that could cause a patient's sciatic nerve injury (palsy) during such surgery. He could not be certain whether any of them contributed to Plaintiff's injury, or whether it was a complication that could happen during any hip replacement surgery. Even when an orthopedic surgeon is doing the best job possible, the sciatic nerve can still be injured in several ways during surgery, somewhere between one to nine

12

percent of the time. Dr. Swenson did not see any indication that her positioning during surgery was over-lengthened, so as to cause excessive tension on the sciatic nerve.

According to Dr. Swenson, an orthopedic surgeon has no way of knowing whether a patient has a sciatic nerve running through the piriformis muscle, because the surgeon does not go looking for the nerve during the surgery. Ninety percent of the time, the sciatic nerve runs underneath the piriformis muscle, but in one or two percent of cases, the nerve runs through the muscle. In some surgery cases using a posterior approach, the piriformis muscle must be released before the surgeon can access the operative field. Dr. Swenson testified that Plaintiff's limb length discrepancy, one centimeter, represents a surgery result that is within the standard of care. There are a lot of variables to take into consideration to match the two limbs. However, "leg length is not the absolute most important thing. The absolute most important thing is to have a stable, well-positioned, moving hip," and he did not know of any evidence that this was not the case here.

During closing argument, Plaintiff acknowledged there are many ways in which such a surgery can result in nerve damage from traction and tension, and suggested to the jury that her injuries were caused by Defendant's inattention to her situation. The jury received appropriate instructions for determining whether Defendant had breached the appropriate standard of care for an orthopedic surgeon. The jury was advised that success is not required, and an orthopedic surgeon is negligent only if he or she was not as skillful, knowledgeable or careful as a reasonable orthopedic surgeon would have been, under similar circumstances.

13

After deliberating, the jury returned a verdict in favor of Defendant, by answering "No" to the question of whether Defendant was negligent in the care and treatment of Plaintiff. The jury accordingly did not respond to question 2, on substantial factor causation. This appeal followed.

## III

### *CAPACITY OF WITNESS: EXPERT OR TREATING PHYSICIAN*

In response to Plaintiff's claims of error on appeal, Defendant takes the position that it does not matter whether Dr. Filler was properly to be characterized as a treating physician or a nonretained percipient expert, since it was appropriate for other reasons for the trial court to limit his opinion testimony. Defendant contends Dr. Filler's testimony on causation and damages factors would be duplicative of the opinions offered by the other designated medical expert witness for Plaintiff. (See *Scalere v. Stenson* (1989) 211 Cal.App.3d 1446, 1454 (*Scalere*) [proper for court to restrict a second expert witness's testimony to "any 'area that hasn't been gone into' "].) Moreover, he argues Plaintiff had not shown that Dr. Filler had an adequate foundation for rendering such expert opinions in this context of orthopedic surgery, which he did not practice. Defendant further claims there could have been no prejudice, since the jury never reached the causation questions in the given sequence of the special verdict.

For purposes of addressing Plaintiff's arguments about abuse of discretion in excluding Dr. Filler's evidence, we accept the proposition that on this record, Dr. Filler can fairly be considered to be a treating physician in some sense. Plaintiff's longtime treating doctor, Dr. Ocampo, commissioned and received Dr. Filler's imaging report for

14

her. He recommended a treatment plan, although there was no showing it was ever implemented. It is not disputed that Plaintiff promptly notified Defendant when she consulted Dr. Filler, and Defendant immediately took his deposition, upon receiving her amended designation of him as a nonretained expert. By filing the motion in limine, Defendant effectively preserved all objections to the capacity of the witness and his proposed substantial factor causation testimony.

At the section 402 hearing, Dr. Filler was cross-examined, saying that although he was not a retained expert in this case, he read the defense motion in limine and Plaintiff's response, and filed a declaration supporting the legal validity of his evidence as related to Plaintiff. Defense counsel asked him whether he was indicating, from his perspective, that there must have been a significant and excessive mechanical force that was applied to Plaintiff's sciatic nerve during surgery. Dr. Filler responded that during his deposition, he had been asked to come up with different scenarios under which the injury could have occurred, and was able to conclude that some type of unacceptable level of mechanical force was applied in order to cause what he saw in the study.

Traditional distinctions between a treating doctor and an expert medical witness are not determinative of the issues Plaintiff raises on appeal. "A treating physician is a percipient expert, but that does not mean that his testimony is limited only to personal observations. Rather, like any other expert, he may provide both fact and opinion testimony. As the legislative history clarifies, what distinguishes the treating physician from a retained expert is not the content of the testimony, but the context in which he became familiar with the plaintiff's injuries that were ultimately the subject of litigation,

15

and which form the factual basis for the medical opinion." (*Schreiber, supra,* 22 Cal.4th 31, 35-36.)

In some cases, it is possible for a treating physician to be transformed into a retained expert, such as where counsel supplies the physician with "additional information and ask[s] him to testify at trial to opinions formed on the basis of that additional information." (*Dozier v. Shapiro* (2011) 199 Cal.App.4th 1509, 1521.) When that occurs, the treating physician goes beyond the traditional role of examining a patient by receiving additional materials from counsel after his deposition and using them to form an opinion about another doctor's adherence to the standard of care, and the rules for disclosing new information from a retained expert apply. (*Ibid.; Schreiber*, *supra*, 22 Cal.4th at p. 38; see *Ochoa v. Dorado* (2014) 228 Cal.App.4th 120, 141 [plaintiffs were entitled to present testimony, outside of expert witness disclosure rules, from nonretained treating physician on subject of reasonable value of medical services, "*as long as such testimony is based on facts acquired in the physician-patient relationship or otherwise acquired independently of this litigation,*" but not acquired for the purpose of forming and expressing an opinion in preparation for trial; italics added].)

Plaintiff cannot be heard to argue that Dr. Filler was merely a treating doctor who should be exempt from expert disclosure requirements, since he would be testifying with the background of having reviewed the motion in limine materials, such as an expert would be required to do. We also find unpersuasive her claim that other doctors perform this kind of imaging study, and Defendant possibly could have found another opposing expert in a timely manner.

16

The relevant facts are that not only did Dr. Filler make personal observations in his study, but he also reviewed material each counsel had prepared for trial. (*Schreiber*, *supra,* 22 Cal.4th at p. 38.) The current problem is whether the trial court's ruling in limine properly evaluated the proposed scope of Dr. Filler's testimony in light of the relevant procedural circumstances, which include Plaintiff's previously disclosed designation of another medical expert, an orthopedic surgeon, and Dr. Filler's review of the defense motion in limine and opposition to it, in preparation for the section 402 hearing. (§ 723; *Dozier v. Shapiro*, *supra*, 199 Cal.App.4th 1509, 1521 [doctor reviewing records as an expert is no longer merely a treating physician, and can be precluded from testifying to opinions formed for purposes of litigation, without previous disclosures].)

IV

*EXERCISE OF DISCRETION IN EXCLUDING TESTIMONY*

A.  Introduction

An abuse of discretion standard of review applies to this ruling placing limits on Dr. Filler's testimony. (*Sargon Enterprises, supra,* 55 Cal.4th 747, 773.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Ibid*.) In exercising its discretion, the trial court must act within the confines of the applicable legal principles and consider whether the ruling "implicates a party's ability to present its case." (*Ibid.*)

During the section 402 hearing, Plaintiff mainly contended that Dr. Filler's analysis would be relevant on issues of substantial factor causation, as well as treatment. His opinions also appeared to extend to whether the professional standard of care was

met in this instance. The respondent's brief interprets Plaintiff's opening brief as focusing only upon the exclusion of his opinions as to causation and damages. Defendant thus claims any error in excluding such testimony would have been harmless, since the jury did not reach the causation and damages questions, after deciding Defendant was not negligent.

As previously outlined, the trial court essentially treated Dr. Filler as a nonretained expert, or a specialist consultant who was assisting the treating doctors and evaluating the surgery in hindsight. This was a reasonable approach under the circumstances, and based on the manner in which Plaintiff has briefed the appeal, we decline to address whether Dr. Filler's offer of proof could also be construed as addressing a broader range of issues, such as breach of the standard of care. We address Plaintiff's claims only as to prejudice on the causation and damages questions.

### B. Foundational Questions

Plaintiff's designation of Dr. Filler as a nonretained expert implicated the trial court's "gatekeeping" responsibility. (*Sargon Enterprises, supra,* 55 Cal.4th 747, 769.) The court was required to assure that the foundational predicates for admission of any expert testimony were met, such that it would assist the trier of fact in evaluating the issues to be decided. (*Id.* at p. 770; § 802; *Jennings, supra,* 114 Cal.App.4th 1108, 1117; *Sargon Enterprises, supra,* at pp. 771-772 [inquiry includes whether opinion is based on unsupported reasons or is speculative].)

On causation, the plaintiff must establish "it is more probable than not the negligent act was a cause-in-fact of the plaintiff's injury." (*Jennings*, *supra*, 114

18

Cal.App.4th 1108, 1118; italics omitted.) " 'A possible cause only becomes "probable" when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action.' " (*Ibid.*, italics omitted.) "[C]ausation in actions arising from medical negligence must be proven within a reasonable medical probability based on competent expert testimony, i.e., something more than a '50-50 possibility.' " (*Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1504.) "[T]he evidence must be sufficient to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result." (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 216.)

To assist in a causation determination, the expert must be able to explain why the researched facts convincingly led to a conclusion that it is more probable than not that a given negligent act was a cause-in-fact of the subject injury. (*Jennings, supra,* 114 Cal.App.4th at p. 1118; *Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 578 [insufficient basis if expert gives opinion about theoretical possibilities or speculates about causation of injury].)

An initial problem with Dr. Filler's qualifications to express opinions about causation is that he does not perform such hip replacement surgery. He has treated at least 20 patients on neurological issues, after they received such surgery. In this case, he did not review the operative report or Defendant's medical records, mainly reviewing the study he ordered and in limine materials. Although he was allowed to testify that he could see damage had occurred to the sciatic nerve, the court appropriately found he lacked a foundation to discuss how the damage was caused. He could not quantify the

19

amount of force that would injure the sciatic nerve during surgery, but said it must have been more than the nerve could tolerate. He could only speculate that "most likely" it was a misplaced retractor or slippage of the hip joint element that damaged the nerve. His declaration gave the opinion that it was "more probable than not" that the surgery had caused the nerve injury.

Although Plaintiff complains that in making its ruling, the trial court did not specifically address substantial factor issues, the context of the ruling makes it clear that the court had all the appropriate considerations before it. Using either formulation of Dr. Filler's opinions, the trial court had a reasonable basis to conclude that his views on causation were too speculative to present to the jury. Based on the limited nature and late timing of the work he performed for Plaintiff, the court had reason to determine that the jury would not have been materially assisted by these opinions when deciding the issues submitted to it. No abuse of discretion is apparent in its conclusions.

## C. Cumulative Nature of Testimony

When Dr. Meinberg testified as Plaintiff's designated expert, he explained the operative report did not clearly indicate whether or how Plaintiff's position during surgery had caused her problems. He found the injury was not spontaneously arising, and the manner of performance of surgery was a substantial factor in contributing to the ultimate injury. Specifically, "judging by the difficulty in relocating the hip, we know that the nerve was stretched too much," contributing to sciatic nerve injury. Generally, however, sciatic nerve injury will occur when the nerve is either stretched or inappropriately positioned for too long a period. He believed that Plaintiff's injury was a

20

combination of the leg length discrepancy along with how other protocols were used during surgery.

Dr. Swenson testified as a defense expert that there were many mechanisms, such as pulling too hard, that could cause a patient's sciatic nerve injury during such surgery. He could not be certain whether any of them had contributed to Plaintiff's injury, or whether it was a complication that could happen during any hip replacement surgery. When Defendant testified, he explained that it was necessary to use some force to install and test the trial implants, and that when he settled on one of appropriate size, it was working great.

On appeal, Plaintiff argues that the testimony she provided from Dr. Meinberg did not adequately address all essential issues concerning substantial factor causation of injury, because his main focus was upon the limb length discrepancy resulting from the surgery. She states, "[W]hereas Dr. Meinberg, an orthopedic surgeon, testified that the standard of care was violated due to the length problem with [her] leg and this caused her injury, Dr. Filler, a neurosurgeon, was going to testify that the excessive force used was the cause of [Plaintiff's] injured sciatic nerve. Thus, there would have been different testimony by two different types of doctors regarding causation and both were a substantial factor in causing [her] injuries." She accordingly claims Dr. Filler's testimony would not have been duplicative, and would have addressed the substantial factor issue as reflected in the instruction given the jury. (CACI No. 430.)

There are several problems with this argument. First, Dr. Filler would have had to address different manners of violation of the applicable standard of care, an issue which

21

we have said has not been brought before us in this appeal. Next, Dr. Meinberg was Plaintiff's designated expert for testimony on standard of care, causation and damages, and he discussed whether the nerve had been stretched too much, such as through the positioning during surgery or the use of retractors. That testimony was roughly equivalent to considerations about an excessive use of force, such as Dr. Filler was suggesting. Dr. Meinberg also stated that the length discrepancy alone was not a problem, and that there were protocols used during the surgery that in his opinion, did not meet the standard of care.

Under these circumstances, Dr. Filler's opinions about an excessive use of force would have been cumulative and would not have addressed an " 'area that hasn't been gone into.' " (*Scalere*, *supra*, 211 Cal.App.3d 1446, 1454.) The jury understood that some force had to be used during the hip replacement surgery, within the appropriate standard of care for this type of professional. There was defense testimony that Defendant took appropriate steps to minimize compression and stress on the nerves, and that this type of injury can occur even when standards of care are met.

The trial court had the discretion to make determinations on whether the opinion testimony regarding causation that Plaintiff offered from Dr. Filler was unduly cumulative, in view of the previous expert designations made. (§§ 723, 352.) Plaintiff cannot show she was unfairly deprived of the opportunity to present evidence on the relevant elements of her negligence case, or that a different result was probable if the disputed evidence had been admitted. (*Sargon Enterprises*, *supra*, 55 Cal.4th at p. 773; *P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1348.)

22

DISPOSITION

The judgment is affirmed.  Costs on appeal to Respondent.


                                                    HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


AARON, J.


23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ANGELA BELFIORE-BRAMAN et al., | D072015 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2014-00022910-CU-MM-CTL) |
| D. DANIEL ROTENBERG, M.D., | |
| Defendant and Respondent. | |

THE COURT:

The opinion in this case filed June 26, 2018 was not certified for publication.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

HUFFMAN, Acting P. J.

Copies to: All parties